Filed 6/16/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S216444 |
| v. | ) | |
| | ) | Ct.App. 2/1 B239519 |
| JEFFREY HUBBARD, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. Nos. SA075027, |
| _____ | ) | BA382926 |

In this case we must determine the scope of liability under a criminal statute enacted in 1872 proscribing the misuse of public funds. Penal Code section 424 applies to "[e]ach officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys." (Pen. Code, § 424, subd. (a) (section 424(a)).)[1] Before us are two questions arising from this provision. The first is whether the statute applies to all public officers, or only to those "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." Because we hold that section 424 applies only to those public officers imbued with such responsibility over public moneys, we must answer a second question: whether sufficient evidence supported the jury's verdict finding that defendant Jeffrey

---

[1] Unless otherwise stated, all statutory references are to the Penal Code. In addition, we will refer to the various provisions of section 424(a) in the following form: section 424(a) 1, section 424(a) 3, etc.

1

Hubbard, who served as superintendent of the Beverly Hills Unified School District (the District), was charged with the "receipt, safekeeping, transfer, or disbursement" of public funds. In light of Hubbard's explicit contractual responsibilities to oversee the "budget and business affairs" of the District, testimony that superintendents like Hubbard owe a duty to safeguard school district funds, and Hubbard's responsibility to ensure such public funds were spent in accordance with the law, we hold the evidence was sufficient.

Accordingly, we reverse the judgment of the Court of Appeal and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

In a consolidated information and indictment filed on January 3, 2012, the District Attorney of the County of Los Angeles charged Hubbard with three counts of misappropriating public funds in violation of section 424(a) 1. The charges were tried to a jury, which found Hubbard guilty on the first two counts and not guilty on the third. The following facts emerged at trial.

Hubbard served as superintendent of the District from July 1, 2003, to June 30, 2006. In that role, Hubbard was chief executive officer of the District, overseeing the various departments therein. Those departments included human resources, business, and accounting. Among the duties listed in Hubbard's employment contract was the responsibility to provide leadership and direction ensuring successful policy implementation in the area of "budget and business affairs." Hubbard was also explicitly responsible under his employment contract for taking the lead on financing for school facilities. Joseph Jones, assistant executive director for the Association of California School Administrators (ACSA), testified that superintendents need to know the business side of running a school district, including "where all the finances come through and the revenues come through so [superintendents] can expend those revenues on behalf of

2

schoolchildren." Through courses taught by ACSA, superintendents learn about how state budgeting affects their districts, how to expend public funds, and how to use those funds on behalf of the students they serve.

In those same courses, superintendents are instructed that "they have a fiduciary responsibility to protect the funds of the school district in which they serve." Hubbard, who taught some of these courses, testified that he had discussions with his student administrators — who were training for careers in education administration — about their ethical and legal obligations with respect to public funds. Hubbard testified further that, pursuant to his duty under the law, he had familiarized himself with the rules governing superintendents.

During Hubbard's tenure as superintendent, Karen Christiansen worked for the District as the director of planning and facilities. Christiansen's contract provided for an annual salary of $113,000 and a monthly automobile allowance of $150. In late 2005 and early 2006, Hubbard wrote two memoranda regarding Christiansen's compensation. These directives, written on District letterhead and in Hubbard's official capacity as "Superintendent of Schools," proved central to the prosecution's case against him.

The first memorandum, dated September 29, 2005, included only two short sentences. Hubbard wrote: "Please note that effective September 1, 2005, Ms. Christiansen is to receive a $500.00 auto allowance per month. Thank you." This memorandum, which Hubbard initialed, was addressed to Melody Voyles, who worked in payroll. Copied on the memorandum were Sal Gumina, the assistant superintendent for human resources, and Nora Roque, the human resources coordinator. The recipients interpreted the memorandum as a directive, which they were expected to follow. Hubbard testified that Christiansen's monthly auto allowance was augmented to reflect an increase in her travel responsibilities after

3

she took on additional work previously performed by a construction management firm up until fall 2005.

In the second memorandum, dated February 6, 2006, Hubbard wrote: "Please note that Ms. Christiansen is to receive a $20,000 stipend. Thank you." This memorandum, which Hubbard also initialed, was addressed to Roque and copied Voyles, both of whom interpreted it as a directive. No assistant superintendent was included on this memorandum. Hubbard testified that the stipend was intended to compensate Christiansen for additional work she had performed following the construction management firm's termination.

Voyles indicated that "from time to time" she received direction from the superintendent to change an employee's pay. When she did, she sought to comply with her superior's instruction. Roque also testified that she had received similar requests for providing or adjusting employee stipends. Accordingly, memoranda in this case did not raise any red flags in the minds of Voyles and Roque; they were simply following Hubbard's orders — orders that, according to Hubbard's testimony, the superintendent expected his subordinates to carry out. There was no indication that Hubbard considered the content of the memoranda, or the fact he had written them, to be unusual.

The parties do not dispute that both the increased auto allowance and the stipend required approval by the District's Board of Education (the Board), a five-member body that held meetings twice a month. Although Hubbard was responsible for preparing an agenda for the Board in advance of each meeting and for implementing the Board's decisions, he lacked the unilateral authority to order either payment. The Board would discuss confidential matters, including employee compensation, in closed session prior to the open, public portion of the meeting, but any decision on such matters had to be ratified by a Board vote in open session. Hubbard was responsible for ensuring that minutes were taken and

4

that those minutes accurately reflected what was approved during Board meetings, including any public expenditures. As superintendent, Hubbard attended both the closed and open sessions of the regular Board meetings.

In order for the Board to approve a change in an employee's compensation, the change had to be included in a personnel report. The superintendent would direct the human resources department to prepare such personnel reports. Once the human resources department had compiled the necessary paperwork, the reports would be submitted to the superintendent for review. It was the superintendent's responsibility to ensure all personnel reports were then included in the packet of materials the Board would receive prior to each meeting.

Christiansen received both the $500 monthly auto allowance and the $20,000 stipend. A central point of contention at trial was whether or not the Board ever approved either payment. Two Board members testified that the Board never discussed or approved either the auto allowance or the stipend. Other personnel from the District — including Gumina, Roque, and Voyles — either had no memory of the payments or the procedure that had led to Christiansen's receiving them, or had no knowledge whether the payments had been approved by the Board. The District's assistant superintendent of business services testified that District personnel had searched the Board minutes from meetings "in and around" the time of the auto allowance and stipend and did not find the payments mentioned in the minutes from those meetings. The prosecution introduced exhibits containing agendas, minutes, and personnel reports from a number of the Board meetings that occurred around the time Hubbard prepared the memoranda regarding the payments to Christiansen. These materials contained no mention of either the auto allowance or the stipend.

Hubbard testified that the Board had discussed both the auto allowance and the stipend in closed session. According to Hubbard, there were no objections to

5

either payment, so he prepared the September 29 and February 6 memoranda directing that the payments be made. The memoranda were either addressed or copied to individuals in the human resources department, which would have been responsible for preparing the personnel reports had any been submitted to Hubbard for presentation to the Board. Hubbard admitted there was no documentation indicating that the Board had ever approved these payments.

The trial led to Hubbard's convictions, which he appealed. The Court of Appeal reversed, vacating all penalties and directing the superior court to enter an order dismissing all charges. The appellate court concluded that Hubbard could not have violated section 424 because, in its view, Hubbard was not a "person charged with the receipt, safekeeping, transfer, or disbursement of public moneys." The Court of Appeal so held because Hubbard lacked the formal authority to approve the payments to Christiansen — such authority lay solely with the Board. Instead, the court found, he "was merely 'the first step in a process that results in the expenditure of public funds.' " As Hubbard lacked the unilateral authority to approve the payments to Christiansen, the Court of Appeal found that he "[could not] be criminally liable under section 424."

To reach this conclusion, the Court of Appeal rejected the Attorney General's alternative argument that section 424 applied to Hubbard because, as superintendent, he was an "officer" of the District[2] irrespective of whether he was *also* a "person charged with the receipt, safekeeping, transfer, or disbursement of public moneys." The Court of Appeal noted that it could find no case that had adopted this construction of section 424. The court concluded further that such a construction was foreclosed by *People v. Dillon* (1926) 199 Cal. 1, 5 (*Dillon*), in

---

[2]     The parties agree that Hubbard was a public "officer" for purposes of section 424.

which we stated that section 424 "has to do solely with the protection and safekeeping of public moneys . . . and with the duties of the public officer charged with its custody or control," and that it addresses "the single subject of the duties of an officer charged with the receipt, safekeeping, transfer, and disbursement of public moneys."

We granted review.

## II. DISCUSSION

The Attorney General maintains that Hubbard is an individual covered by section 424 under either of two interpretations. Initially, the Attorney General contends that, as a public "officer," Hubbard may be liable for violating section 424 regardless of whether he is a "person charged with the receipt, safekeeping, transfer, or disbursement of public moneys." In the alternative, the Attorney General asserts that even if a public officer must also be charged with the receipt, safekeeping, transfer, or disbursement of public moneys in order to violate section 424, Hubbard satisfies this requirement because the evidence showed he had "some degree of control over public funds" in his role as superintendent.

For the reasons discussed below, we hold that section 424 applies only to those public officers "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." Substantial evidence, we hold further, supports the conclusion that Hubbard was so charged.

### A. Scope of Section 424

To determine the proper scope of section 424, we must resolve a question of statutory interpretation. As with all such questions, our primary task is to give effect to the Legislature's intended purpose in enacting the law. (See *People v. Zambia* (2011) 51 Cal.4th 965, 976-977.) We begin with the statute's text, assigning the relevant terms their ordinary meaning, while also taking account of

7

any related provisions and the overall structure of the statutory scheme. (See *People v. Cottle* (2006) 39 Cal.4th 246, 254.) Essential is whether our interpretation, as well as the consequences flowing therefrom, advances the Legislature's intended purpose. (See *People v. Zambia*, *supra*, 51 Cal.4th at p. 977.) Where the statutory text admits of more than one reasonable interpretation, we may consider various extrinsic aids — including the legislative history — to the extent they are helpful in illuminating that purpose. (See *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198.)

Section 424(a) 1 is the particular provision under which Hubbard was convicted. It provides: "Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who . . . [¶] . . . [w]ithout authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another" is guilty of a crime. Pivotal in determining this provision's applicability to Hubbard is whether it applies to *all* public officers, as the Attorney General contends, or only to those officers "charged with the receipt, safekeeping, transfer, or disbursement of public moneys," as Hubbard contends. Section 424 could be read, in short, as applying to (1) all state, county, city, town, or district officers, and (2) any person "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." Or it could apply instead to (1) state, county, city, town, or district officers "charged with the receipt, safekeeping, transfer, or disbursement of public moneys," and (2) every other person so charged.

Each interpretation settles but also raises textual questions. To accomplish what Hubbard takes to be the statute's function, section 424 could have been written far more parsimoniously to cover "*any person* charged with the receipt, safekeeping, transfer, or disbursement of public moneys." No separate "officer clause" would be needed because an officer is, of course, a person. By giving

8

independent meaning to the public "officer" clause, the Attorney General's approach avoids rendering that clause surplusage — a problem that Hubbard's reading leaves unresolved.

What Hubbard's reading is better at resolving, in contrast, is how to give independent meaning to the word "other" — a word that, under the Attorney General's reading, would be rendered devoid of any meaning. Indeed, the Attorney General's reading of section 424 suggests the statute could have been more clearly written to cover "each officer of this state, or of any county, city, town, or district of this state, *or any person* charged with the receipt, safekeeping, transfer, or disbursement of public moneys." Instead, section 424 uses the phrase "*and* every *other* person" (italics added), which is inherently relational. The use of "other" suggests that the previously referenced public "officer[s]" share the same characteristic as the "person[s]" mentioned immediately thereafter — namely, that the public officers must also be "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." Under Hubbard's reading, then, the word "other" refers back to — and limits — the class of public officers subject to section 424.

Though the text does not rule out either interpretation, we conclude that Hubbard's is the one most closely aligned with what we reasonably can discern about the Legislature's purpose in enacting section 424: protecting the public fisc and holding accountable those in a position to place public funds at risk. (See *Dillon*, *supra*, 199 Cal. at p. 6 [explaining that "the subject matter and the language of section 424 clearly indicate that the legislative mind was intently concerned with the single, specific subject of the safekeeping and protection of public moneys"].) As indicated at the outset, the Legislature enacted section 424

9

as part of its 1872 adoption of the Penal Code. The commissioners who drafted the code explained in an accompanying note[3] that section 424 was "founded upon" several existing laws "peculiarly and especially applicable to the collection, safe keeping, and disbursement of the public revenue." (Code commrs. note foll. Ann. Pen. Code, § 424 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 167 (Commissioners' Note).) Hubbard's interpretation is wholly consistent with that purpose.

In reaching our conclusion, we find the statutory context illuminating. Section 424(a) 1 punishes a person who, without legal authority, "appropriates the same, or any portion thereof," to his or her own use or the use of another. It is clear that "the same, or any portion thereof," refers to "public moneys," which appears immediately above and at the end of the critical phrase "charged with the receipt, safekeeping, transfer, or disbursement of *public moneys*." (Italics added.) The Legislature's express reference to "appropriat[ing]" public moneys suggests that for defendants to come within the provision's ambit, they must have some measure of responsibility over the public funds at issue. The suggestion, in other words, is that it is not enough that one simply be a public officer. (See *Stark v. Superior Court* (2011) 52 Cal.4th 368, 400 (*Stark*) [explaining that § 424 "applies to 'every . . . person' with some control over public funds"].)

Section 424(a)'s remaining provisions support this conclusion. At present, these punish a person who: "2. Loans the same or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law; or, [¶] 3. Knowingly keeps any false account, or makes any false entry or erasure in any

---

[3] We accord the Commissioners' Note "substantial weight" in divining the Legislature's intended purpose. (*People v. Sarun Chun* (2009) 45 Cal.4th 1172, 1187.)

10

account of or relating to the same; or, [¶] 4. Fraudulently alters, falsifies, conceals, destroys, or obliterates any account; or, [¶] 5. Willfully refuses or omits to pay over, on demand, any public moneys in his or her hands, upon the presentation of a draft, order, or warrant drawn upon these moneys by competent authority; or, [¶] 6. Willfully omits to transfer the same, when transfer is required by law; or, [¶] 7. Willfully omits or refuses to pay over to any officer or person authorized by law to receive the same, any money received by him or her under any duty imposed by law so to pay over the same." (§ 424(a).) Any person guilty of the foregoing is quite likely to have been "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." Indeed, it is difficult to imagine the Legislature intended otherwise, especially since several of the provisions closely track the words "receipt," "safekeeping," and "transfer."[4]

The content of these remaining provisions allows us to draw some inferences about the Legislature's purpose in enacting section 424. (See *People v. Garcia* (2016) 62 Cal.4th 1116, 1124 ["Canons of construction — such as the *noscitur a sociis* canon underscoring the value of considering terms in a list in their statutory context — are not mechanical devices, but instead tools that can help us do what we always aspire to do when construing a statute: avoid redundancies, reach a reasonable conclusion about the meaning of terms, and give effect to the Legislature's purpose"].) That content, as shown above, evinces an almost singular concern for individuals charged with some measure of responsibility over public funds. It would be unusual for a statute drafted in this fashion to focus on such individuals in every other provision, but then reach more broadly to all public officers in section 424(a) 1 only. What we reasonably can

_____

**4** None of the provisions of section 424(a) has changed materially since they were enacted in 1872.

11

glean from these surrounding provisions therefore cuts in favor of Hubbard's interpretation of section 424's prefatory language. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391 [explaining that canons of statutory construction such as *noscitur a sociis* act as a "guide[]" that may be useful in elucidating the Legislature's intended purpose].)

Nor do we find it implausible that the Legislature, in crafting section 424, could have decided to underscore the importance of public officers by listing them in a separate clause, while at the same time intending the statute to cover only those officers charged with some responsibility for public funds. (See *TMW Enterprises, Inc. v. Federal Ins. Co.* (6th Cir. 2010) 619 F.3d 574, 578 [explaining that "lawyers frequently say two (or more) things when one will do or say two things as a way of emphasizing one point"]; see also Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 176 ["Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance . . ."].) That such text commanded lawmakers' ultimate support could have reflected the extent to which — at the time section 424 was enacted in 1872 — the far more limited number of public officers in existence were perhaps assumed to exercise some degree of responsibility over public funds.

Hubbard's interpretation is also in accord with how we have long characterized section 424's scope in our previous decisions. In *Dillon*, decided in 1926, we rejected a city commissioner of finance's argument that, instead of being prosecuted under section 424, a general intent statute, he should have been prosecuted under section 504, which requires specific intent to defraud. (*Dillon*, *supra*, 199 Cal. at pp. 5-11.) Arriving at this conclusion, we suggested repeatedly that section 424 applies only to those public officers charged with some responsibility for public funds. (See *Dillon*, at p. 5 ["It is clear that [section 424] has to do solely with the protection and safekeeping of public moneys as defined

12

by section 426 of the Penal Code, and with the duties of the public officer *charged with its custody or control*" (italics added)]; *id.* at p. 6 ["the subject matter and the language of section 424 clearly indicate that the legislative mind was intently concerned with the single, specific subject of the safekeeping and protection of public moneys and the duties of public officers *in charge of the same*" (italics added)]; *id.* at p. 10 ["To again state the situation more succinctly, section 424 has to do solely with the receipt, safekeeping, transfer, and disbursement of public moneys *by official custodians*" (italics added and omitted)].)

A half-century later, in *Stanson v. Mott* (1976) 17 Cal.3d 206, we addressed the liability of a public official to repay public funds that were improperly expended. Citing section 424 and *Dillon*, we recognized that "*public officials who either retain custody of public funds or are authorized to direct the expenditure of such funds* bear a peculiar and very grave public responsibility, and that courts and legislatures, mindful of the need to protect the public treasury, have traditionally imposed stringent standards upon such officials. [Citations.]" (*Mott*, at p. 225, italics added.) We therefore concluded that "*such public officials* must use 'due care,' i.e., reasonable diligence, in authorizing the expenditure of public funds, and may be subject to personal liability for improper expenditures made in the absence of such due care." (*Id.* at pp. 226-227, italics added.)

And most recently, in *Stark*, *supra*, 52 Cal.4th 368, we held that individuals could be convicted under section 424(a) 1 if they were criminally negligent in failing to know that their actions were not legally authorized. In so holding, we presumed that section 424 applies only to those public officers charged with some responsibility for public funds. (See *Stark*, at p. 402 [explaining that section 424 applies to "*those* charged with control of public funds" (italics added)].) We did so because "*those who transfer and disburse public money* bear significant public responsibility," and, consequently, "they may be held to a standard of criminal

13

negligence." (*Id.* at p. 403, italics added.)  In fact, no case of ours — or of any lower court, for that matter — has ever upheld a conviction under section 424 of a public officer who was *not* charged with the financial oversight responsibility that section 424 references.  Even in this case, the prosecution's theory was premised on Hubbard's being a public officer "charged with the receipt, safekeeping, transfer, or disbursement of public moneys."[5]

We note further that Hubbard's interpretation of section 424 is not inconsistent with the statute's legislative history.  That history, as indicated above, suggests that section 424 was "founded upon" four laws:  sections 66 and 67 of an act concerning "Crimes and Punishments" (Stats. 1850, ch. 99, pp. 229, 236 (the 1850 Act));[6], [7] section 1 of an act to provide for the "Punishment of Embezzlement of Public Money" (Stats. 1851, ch. 111, p. 425 (the 1851 Act);[8]

---

[5]     At trial, the prosecution argued that Hubbard was guilty under section 424 because he was "charged with the receipt, safekeeping, transfer, or disbursement of public moneys"; not simply because he was a public officer.  In the charging document, for example, the prosecution alleged that Hubbard was "a person described in Penal Code section 424 charged with the receipt, safekeeping, transfer, and distribution of public moneys," and that he misappropriated said moneys.  The charging document did not allege that Hubbard was an officer.

[6]     Section 66 of the 1850 Act provided:  "Every servant, officer, or person employed in any public department, station, or office of the government of this State, or of any county of this State, or in any office of a corporate body, who shall embezzle, steal, secrete, or fraudulently take and carry away any money . . . being the property of said State, county, or Corporate body" is guilty of a crime.  (Stats. 1850, ch. 99, § 66, p. 236.)

[7]     Section 67 of the 1850 Act provided:  "any officer or person" who is "intrusted by law to collect, disburse, receive, or safely keep any money or moneys . . . belonging to this State" and who "shall fail or refuse to pay over all moneys . . . when such officer or person shall be thereto required by law" is guilty of a crime.  (Stats. 1850, ch. 99, § 67, p. 236.)

[8]     Section 1 of the 1851 Act provided:  "if any officer of the State, or of any County, City or Town in this State, charged with the safe keeping, transfer, or

*(Footnote continued on next page.)*

14

and sections 1-3 of an act to provide for the better keeping, protection, and disbursement of "Public Moneys" (Stats. 1863, ch. 88, p. 97 (the 1863 Act)).[9] (See Commissioners' Note, *supra*, foll. Ann. Pen. Code, § 424, at p. 167.)  Of those four laws, the 1851 Act, section 1, which applied to "[public] officer[s] . . . charged with the safe keeping, transfer, or disbursement of public moneys," most closely resembles the relevant portion of section 424.  And Hubbard's interpretation yields a plausible explanation for why the words "and every other person" were added — namely, to expand the reach of the 1851 Act to include persons other than public officers who happened to be charged with some responsibility for public funds.

In fact, among the forerunners to section 424, only one — section 66 of the 1850 Act — was not expressly aimed at officers "charged with" handling, or "intrusted by law" to handle, public funds.  Section 66 applied instead to *all* public officers (as well as corporate officers) regardless of whether they were charged with some responsibility for public funds.  That three of the four laws on which section 424 was based applied to officers charged with some responsibility for public funds lends additional support to our adoption of Hubbard's interpretation.  By the same token, however, the Commissioners' Note suggests that section 424

---

*(Footnote continued from previous page.)*

disbursement of public moneys shall convert to his own use in any way whatever . . . every such act shall be deemed and adjudged to be an embezzlement of so much of said moneys as shall be thus taken, converted, invested, used or loaned . . . ."  (Stats. 1851, ch. 111, § 1, p. 425.)

[9]      Sections 1-3 of the 1863 Act described the duties of public officers entrusted "with the collection of any of the public moneys of this State" (§ 1) and "with the custody and disbursement of any of the public moneys" (§ 2), including the duty "to keep all public moneys, while the same are in their custody or under their control, in their own possession" (§ 3).  (Stats. 1863, ch. 88, p. 97.)

was "founded upon" section 66 no less than the other three, so we decline to infer too much from this fact. Either way, the legislative history is not inconsistent with the interpretation we adopt.

Because that interpretation is firmly rooted in section 424's text and purpose, as well as in our own precedent, we hold that for a public officer to be convicted under this statute, he or she must be "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." We will therefore uphold Hubbard's conviction so long as there was substantial evidence presented to the jury that he was so charged.

**B. Sufficiency of the Evidence**

The jury found Hubbard guilty of two counts of misappropriating public funds in violation of section 424(a) 1. In reaching its verdict, the jury accepted the prosecution's theory of the case that Hubbard was "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." The core of Hubbard's argument before us — an argument the Court of Appeal accepted — is that the evidence failed to establish that he was so charged. We disagree.

Where, as here, a defendant challenges the sufficiency of the evidence on appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *In re Jorge M.* (2000) 23 Cal.4th 866, 888 [reversing Court of Appeal's judgment when, "[v]iewed in a light favorable to the trial court's judgment [citation], the evidence was sufficient for a reasonable trier of fact to find [guilt] beyond a reasonable doubt"].) A reviewing court must reverse a conviction where the record provides no discernible support for the verdict even

16

when viewed in the light most favorable to the judgment below.  (See *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1221.)  Nonetheless, it is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 128.)  And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

We begin our analysis of whether such justification is present by emphasizing what the text makes plain:  section 424 applies not only to those persons responsible for disbursing public moneys, but also to those responsible for their "receipt," "safekeeping," or "transfer."  (See Black's Law Dict. (10th ed. 2014) p. 282, col. 2 [defining "charge" as, inter alia, to "entrust with responsibilities or duties"].)  Given the range of duties within the ambit of section 424 — and considering the " 'essential public interest' " the statute serves — we have previously indicated the law applies broadly, "to 'every . . . person' with *some control over public funds*."  (*Stark*, *supra*, 52 Cal.4th at p. 400, italics added.)

That control need not be the defendant's primary responsibility.  (See *People v. Aldana* (2012) 206 Cal.App.4th 1247, 1253 (*Aldana*) [" ' "to be charged with the receipt, safekeeping, transfer, or disbursement of public moneys" within the meaning of section 424 requires only that the defendant have *some degree of control over public funds* and that control need not be the primary function of defendant in his or her job' "].)  Nor must the defendant physically possess the public funds.  (See *People v. Groat* (1993) 19 Cal.App.4th 1228, 1232 (*Groat*) ["A defendant need not ever have actual possession of public moneys"].)  And,

17

critically, the exclusive legal authority to spend public moneys need not be vested with the defendant. (See *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, 523 [whether a public officer is "charged with" handling public funds turns on practical control, not statutory duties alone].)

Nonetheless, where an individual merely plays a role in the first step of a process that results in the expenditure of public funds, that role is generally insufficient to establish criminal liability under section 424. (See *Aldana*, *supra*, 206 Cal.App.4th at p. 1254.) The defendants in *Aldana* were the administrator of a public hospital and a physician the administrator had hired to be a liaison for risk assessment. (*Id.* at pp. 1250-1251.) The physician was paid by the hour for this work, and the government program that funded his position required him to report the hours worked during each pay period on a timesheet certified by his supervisor. (*Id.* at p. 1251.) The physician signed blank timesheets that the administrator later filled in and signed herself. (*Ibid.*) Both defendants acknowledged that the hours on the timesheets did not accurately reflect the number of hours the physician had actually worked on any given day. (*Ibid.*)

The physician was convicted of keeping a false account under section 424(a) 3. (*Aldana*, *supra*, 206 Cal.App.4th at p. 1252.) But the Court of Appeal reversed, finding that the physician was not a person charged with the receipt, safekeeping, transfer, or disbursement of public moneys. (*Id.* at p. 1255.) Relying on *Groat* for the proposition that an individual is so charged as long as he or she has some degree of control over public funds, the *Aldana* court reasoned that merely signing one's own timesheets does not, without more, demonstrate that a defendant has *any* degree of control over public funds. (*Id.* at pp. 1253-1254.) The physician, the *Aldana* court noted, was not able to authorize his own pay; approval authority for his timesheet lay elsewhere. (*Id.* at p. 1254.) Because there was no evidence the physician exercised any control over public funds beyond

18

having signed his own blank timesheets, the *Aldana* court found there was insufficient evidence to sustain the conviction under section 424. (*Id.* at p. 1255; cf. *Groat*, *supra*, 19 Cal.App.4th at p. 1234 ["Because she had the authority to certify her own time card, appellant had control over those public funds eventually paid to her as salary and therefore is a person charged with their disbursement for purposes of section 424"].)

What the *Aldana* court correctly concluded is that the statute was not intended to punish every individual whose action or inaction could conceivably have consequences for the public fisc. Some individuals, such as the physician in *Aldana*, may not be punishable under section 424 because their conduct and position indicate they bear too tenuous a relationship to the receipt, safekeeping, transfer, or disbursement of public funds. To account for this circumstance, we hold that an individual is "charged with the receipt, safekeeping, transfer, or disbursement of public moneys" under the meaning of section 424 so long as he or she exercises a degree of material control over public funds that amounts to being "charged with" such authority. (See *Stark*, *supra*, 52 Cal.4th at p. 400.)

Whether someone exercises this degree of material control over public funds depends on actual function as much as — if not more than — formal title. (See *Webb v. Superior Court* (1988) 202 Cal.App.3d 872, 887 ["The fact that petitioner was not directly, in his job description or the common responsibilities of his position, charged with receipt, safekeeping, transfer or disbursement of public funds does not necessarily preclude a prosecution under section 424. It is sufficient if the public official controls public funds so as to cause their expenditure for nonpublic purposes"].) In this regard, it is possible to distinguish a person's leadership of an organization in a general sense from the person's bureaucratic responsibilities within that organization. The former may be reflected merely in someone's title, symbolic role, and de facto influence; the

19

latter, on the other hand, concerns the explicit responsibilities someone typically undertakes within the organization — and the extent to which those responsibilities encompass some degree of supervisory authority over the actions of subordinate employees. (Cf. *Henry J. Kaiser Co. v. Industrial Accident Com.* (1947) 81 Cal.App.2d 818, 823 ["it is not the name applied to an officer or employee, such as vice-president, foreman, etc., but rather the actual duty and authority bestowed upon such person that determines the question"].) That someone with a formal title and influence often also has specific powers does not mean that these two kinds of power are necessarily coextensive. And, of course, even if someone has considerable bureaucratic responsibility, that person may still lack the unilateral authority to lawfully direct the ultimate disposition of public funds. (See *People v. Honig* (1996) 48 Cal.App.4th 289, 352 [state superintendent of public instruction convicted of making official contracts in which he had a financial interest could not evade liability by arguing the transactions at issue were "grants" rather than contracts because, in any event, he "has pointed to no legal authority which would permit him to make a unilateral decision to bestow grant money in this fashion"].) Scrutinizing a person's actual and formal responsibilities as they pertain to public funds is therefore essential to the factfinder's determination whether the person has the degree of material control over public funds that will satisfy the standard we have articulated.

We find that standard was met in this case. The evidence showed that, during the relevant time period, Hubbard was the chief executive officer of the District. In his capacity as superintendent, Hubbard oversaw various departments related to the expenditure of public funds, including human resources, business, and accounting. His employment contract made clear that he was responsible for implementing policies in the realm of budgeting and business affairs, and for taking the lead in raising money for school facilities. Hubbard's actual

20

responsibilities mapped onto those prescribed by law. Those statutory duties included: preparing and submitting a budget for the school district, preparing a "local control and accountability plan," assigning and transferring teachers, entering into contracts for and on behalf of the school district, and submitting financial and budgetary reports to the school district's governing board. (Ed. Code, § 35035, subds. (a)-(i).) Hubbard testified that, pursuant to his duty under the law, he had familiarized himself with the rules governing superintendents.

Reflected in the scope of such rules — according to the trial testimony of an executive at ACSA, an organization that teaches school administrators about their responsibilities — is every superintendent's "fiduciary responsibility to protect the funds of the school district in which they serve." Indeed, the ACSA executive testified that superintendents like Hubbard are instructed on their responsibility to protect public funds. Superintendents also need to know the "business side" of running a school district, including "where all the finances come through and the revenues come through so [superintendents] can expend those revenues on behalf of schoolchildren." Through courses taught by ACSA, superintendents learn how to expend public funds on behalf of the students they serve. And Hubbard, who taught some of these courses, acknowledged that he had had discussions with his student administrators about their ethical and legal obligations with respect to public funds.

But there is more. The evidence also showed Hubbard was entrusted with the responsibility of bringing expenditures to the Board for approval and then ensuring District funds were spent according to the Board's instructions. These duties entail a material degree of discretion and control over how public funds are allocated. For instance, Hubbard could select an employee for a compensation increase and direct the human resources department to prepare a personnel report on the matter. Hubbard, who set the agenda for Board meetings, could then

21

submit that report — along with the proposed compensation increase — to the Board for an up-or-down vote. From the evidence, the jury could reasonably infer that the Board would at times defer to Hubbard on such matters. As Hubbard explained it, obtaining Board approval could be as simple as his presenting the request in closed session and asking if there were any objections. Seeing none, Hubbard would steer the Board onward to the next item. Once formal approval was obtained by a Board vote in open session — the evidence here, of course, was that no such approval was obtained — Hubbard could then direct the expenditure of public funds.

Indeed, the evidence indicates that Hubbard secured the improper payments to Christiansen by submitting two memoranda to the human resources and payroll departments he oversaw. The memoranda, which read like directives, included specific dollar amounts, chosen by Hubbard, to be paid to a specific District employee. Hubbard's commands, written on District letterhead and in Hubbard's official capacity as "Superintendent of Schools," were carried out by his subordinates and resulted in the misappropriation of public funds. It was not uncommon for these subordinates to receive direction from their superintendent to change an employee's pay. Hubbard himself testified that he expected his subordinates to carry out these directives. There was no evidence that Hubbard considered the content of the memoranda, or the fact he had written them, to be out of the ordinary. At core, then, Hubbard abused his position of power to arrange for these payments — payments that almost certainly would not have happened but for Hubbard's actions. Based on the foregoing, we conclude there was substantial evidence that Hubbard exercised a degree of material control over public funds that amounted to being charged with those funds' safekeeping or disbursement.

22

The Court of Appeal relied on *Aldana* to reach a different conclusion. But plainly, *Aldana* is distinguishable. A physician who signs blank timesheets for his supervisor to complete is a far cry from a superintendent with a fiduciary responsibility to safekeep school district funds. The physician in *Aldana* had no formal or informal duty delegated to him regarding public funds, and he had no power over the payment or disbursal of such funds. The physician did not even enter the information upon which disbursement decisions would be made. Hubbard, by contrast, selected specific amounts of public money to be paid to a specific employee, and he directed those payments be made using his authority as District superintendent.

The *Aldana* court's statement regarding the physician's inability to authorize his own pay was merely one basis for finding the evidence insufficient to support a section 424 conviction under the facts of that case. *Aldana* did not purport to create a more stringent standard than the one we cited with approval in *Stark* — a standard we clarify today. (See *Stark*, *supra*, 52 Cal.4th at p. 400.) And for good reason. It would make little sense to adopt a formal requirement of approval authority in this case. For one, a requirement that section 424 reach only those persons who exercise unilateral spending authority would seem to exclude most people in financial controller positions, and it is hard to imagine the Legislature would have intended such a result. For another, it is not clear that *anyone* in the state — not the Controller, not the Governor, not anyone else — has the unilateral authority to effect public spending without any constraints. If essentially all government officials are constrained to some extent, the question is whether a person has sufficient bureaucratic responsibility over public finance, budgeting, and accounts to come within the statute's broad language. By emphasizing the extent of actual authority over the receipt, safekeeping, transfer, and disbursement of public funds without concluding that only individuals with

23

unfettered control over such funds should be subject to liability under section 424, our holding is consistent with the statute's text and purpose, as well as the practical realities of governance that properly inform the standard we adopt.

Given such realities, individuals charged with the receipt, safekeeping, transfer, or disbursement of public funds may rarely if ever possess exclusive legal authority or unfettered control over the funds' disposition. What Hubbard was instead endowed with was a considerable degree of actual managerial authority over the supervision of the District's funds — authority that explains why Hubbard's subordinates did not consider it unusual to receive a financial directive from him. Whether or not a school superintendent is also a leader in a more general sense, the relevance of section 424 to the conduct at issue does not turn on the official's symbolic role or title. Far from it. Whether that title enabled an individual to seek influence over coworkers through persuasion or artifice is immaterial.

The standard we adopt today must also be considered in the broader statutory context. That context, we emphasize, imposes additional limitations on who exactly may be prosecuted under section 424. For instance, to be found guilty under section 424(a) 1, a defendant must act without lawful authority; must know or be criminally negligent in failing to know that he or she lacks legal authority; must act with respect to public moneys; and must take sufficiently affirmative action with respect to those moneys that he or she can be said to have "appropriate[d]" them. Section 424, thus, does not punish innocent mistakes by those in positions of public trust. (See *Stark*, *supra*, 52 Cal.4th at p. 400 ["Public officials and others should not be criminally liable for a reasonable, good faith mistake regarding their legal responsibilities. Nor is section 424 intended to criminalize ordinary negligence or good faith errors in judgment"].) Rather, it punishes those like Hubbard who, aware of the wrongfulness of their conduct or

24

criminally negligent of that fact, nonetheless misappropriate the public funds they have a fiduciary responsibility to safeguard. Such conduct is properly punishable under section 424.

### III. CONCLUSION

Public officers face criminal liability under section 424 when they misappropriate public funds and when their control over such funds amounts to being charged with the funds' "receipt, safekeeping, transfer, or disbursement." The statute does not make liability conditional on a public officer's possessing exclusive control over public funds, or unfettered discretion to decide on their disposition. Instead, it requires that the public officer have the sort of actual authority that confers some degree of material control over the funds' disposition. The evidence here supports the jury's conclusion that Hubbard had such control and was therefore "charged with the receipt, safekeeping, transfer, or disbursement of public moneys" — Hubbard owed a general and widely recognized duty to safeguard school district funds, his contract charged him with overseeing the "budget and business affairs" of the District, and he exercised his formal authority in explicitly directing his subordinates to make the payments at issue in this case on his behalf. As a result, we reverse the Court of Appeal's judgment and remand for further proceedings consistent with this opinion.

CUÉLLAR, J.


WE CONCUR:
CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
KRUGER, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Hubbard
_____

**Unpublished Opinion** XXX NP opn. filed 12/31/13 – 2d Dist., Div. 1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S216444
**Date Filed:** June 16, 2016
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Stephen A. Marcus

_____

**Counsel:**

Hillel Chodos and Philip Kaufler for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels, Margaret E. Maxwell, Eric E. Reynolds and Dana Muhammad Ali, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Philip Kaufler
1559 S. Sepulveda Boulevard
Los Angeles, CA  90025
(310) 473-8666

Dana Muhammad Ali
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2868