Filed 5/30/25  P. v. Vaoifi CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051791 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 22CR003060) |
| v. | |
| ROSIE KATHLEEN VAOIFI, | |
| Defendant and Appellant. | |

In 2023, a jury found Rosie Kathleen Vaoifi guilty of corporal injury to a child and criminal threats.  The trial court suspended imposition of sentence and placed Vaoifi on formal probation for four years.

On appeal, Vaoifi contends that there was insufficient evidence to support the conviction for criminal threats.  For the reasons discussed below, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Procedural History*

On December 14, 2023, the Monterey County District Attorney's Office filed a first amended information charging Vaoifi with corporal injury to a child, John Doe (Pen. Code[1], § 273d, subd. (a); count one) and criminal threats (§ 422, subd. (a); count two). The information further alleged several circumstances in aggravation.

On December 15, 2023, following a four-day trial, the jury found Vaoifi guilty of both counts.  The court additionally found true the aggravating circumstance that the

---

[1] Undesignated statutory references are to the Penal Code.

crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness as to both offenses. (Cal. Rules of Ct., rule 4.421(a)(1).) The court also found true the victim was particularly vulnerable (Cal. Rules of Ct., rule 4.421(a)(3)) and Vaoifi took advantage of a position of trust or confidence (Cal. Rules of Ct., rule 4.421(a)(11)) as to only the corporal injury offense (count one).

On January 18, 2024, the date set for sentencing, the trial court suspended imposition of sentence and placed Vaoifi on formal probation for a term of four years. The conditions of Vaoifi's probation required that she complete the following: (1) 360 days in the county jail; (2) 40 hours of community service; and (3) a child abuse counseling program. The court denied Vaoifi's motion pursuant to section 17, subdivision (b), to reduce the criminal threats offense to a misdemeanor.

Vaoifi timely appealed.

**B.     Factual Background**

**1.  Prosecution's Case**

**a.  Testimony of M.H.[2]**

M.H., Vaoifi's former partner, testified that he and Vaoifi had dated on and off for approximately eight years and were the parents of John Doe, who was born in 2016 in Virginia. In 2022, when John was four years old, Vaoifi and M.H. ended their relationship, and Vaoifi moved with John to California. Following the move, M.H. began receiving regular calls from Vaoifi so that he could speak with John. However, M.H. indicated that the calls started to become more concerning as Vaoifi began to indicate she needed help, and things were "a lot difficult" in California. On April 2, 2022, M.H. received a video call from Vaoifi, where Vaoifi was not coherent and "out of her mind" as she asked for help. During the call, M.H. saw John cowering in the background and

---

[2] We refer to the victim in the proceedings by his initials only to protect his personal privacy interests pursuant to California Rules of Court, rules 8.90 (b)(4).

looking visibly afraid. Vaoifi then told M.H. that she would harm John Doe if he (M.H.) did not call and talk to her. She then specifically told M.H. that she could end up "killing [John] or chopping him up like some of the other mothers" she had seen on television. M.H. indicated that at this point, he was "very afraid" for John because he could "tell that [John] was cowering in the background, and what happened in the video … looked very disturbing." M.H. recorded a portion of the video call, which was played for the jury during the trial.

Based on what he witnessed, M.H. felt that Vaoifi was not in the right state of mind and that John should be checked on. M.H. asked his sister to assist him with contacting local law enforcement to check on John. When contacted, M.H. told law enforcement not to break down the door because he felt this would be "very traumatizing" for Vaoifi and John, and he did not want anything bad to happen. M.H. further testified that this was the first time he had ever called the police about Vaoifi's behavior. He felt police involvement was necessary because John "was in a bad position because she [Vaoifi] wasn't in the right state of mind. And the fact that he [John] was, like, fearing in the video, that was enough right there."

Although M.H. testified at trial that Vaoifi only made the statement once about killing or chopping up John, he later confirmed that he had told the responding officer that Vaoifi had threatened to kill John three times that day. He also confirmed that he had told the officer that Vaoifi specifically stated "it would look bad if she killed or chopped up John Doe and broke his neck and she ended up on the news." M.H. subsequently traveled to California to pick up John, and observed bruises on John's face and arms, as well as a cut on his chest.

On cross-examination, M.H. noted that Vaoifi had made similar threats about beating John in the past, but indicated that the April 2, 2022 call was the first time Vaoifi had made a threat "on that level" regarding killing or chopping up John.

3

### b. Police Investigation

Marina Police Department Officer Francisco Tapia testified that M.H. sent him five videos[3] he (M.H.) had recorded during the April 2, 2022 call with Vaoifi. The content of the videos, as described by Tapia, appeared to be the same as the video recording played for the jury during M.H.'s testimony. According to Tapia, the first three videos depicted John sitting on a bed, while Vaoifi yelled obscenities at him, including: (1) telling him to "shut the fuck up" and to get up and fold a blanket; and (2) yelling that "[i]f I put you a fucking show [*sic*], and shut the fuck up. Ain't no one want to hear 'I don't want to watch that.' I don't give a fuck what you want to watch, nigga. I don't want to watch you by myself, but I've been doing it for a whole year. [¶] Do you fucking hear me? I don't want to watch you, but I have to. Okay? So you listen to what the fuck I tell you. You sit the fuck down and shut the fuck up and you leave me the fuck alone. Do you hear me?" The fourth video depicted John getting up off the bed, and a hand coming up behind him, then coming down as though John or the phone had been hit. Tapia also described the video as "violently shaking."

After speaking with M.H., Tapia arrived at Vaoifi's residence and contacted both Vaoifi and John outside their home. Tapia observed that John had what appeared to be fresh injuries to the right side of his face and forehead. Vaoifi was arrested and taken into custody. She later spontaneously told Tapia that she had struck John.

Tapia acknowledged that during his conversation with M.H., which lasted approximately 40 minutes, Tapia asked twice if he should "boot" the door down, to which M.H. responded that this was not necessary as the situation was "not that serious" and Vaoifi often "play[ed] games and shit." However, Tapia indicated that M.H. independently stated twice, without any prompting or questioning, that he was in fear for John's life based on Vaoifi's statements that she was going to kill or choke John.

---

[3] Tapia indicated that two of the videos were the same, and therefore only testified as to the contents of four of the five videos received.

Further, M.H. told Tapia that it appeared Vaoifi was either trying to smother or choke John with a pillow. When asked if such an action exacerbated M.H.'s fear for John's life, Tapia indicated that "it appeared so" based on their conversation.

### c. Doctor's Findings

Dr. Andrew Ortega, the emergency doctor who examined John following Vaoifi's arrest, testified that John came in with visible bruising on his face and arms. Dr. Ortega also discovered multiple other areas of bruising during his examination, as well as a scar or burn mark on John's chest and other scars on his back. He indicated that the bruising was in various areas where he did not typically expect bruises to be, including along John's shoulders and biceps, and two large contusions on the side of John's face and forehead. Dr. Ortega therefore concluded that these injuries were not accidental or the result of normal daily play. He also noted that absent some sort of unknown trauma, such as a car accident, the number of scars on John's body was not typical for a child of his age.

### 2. Defense Case

Vaoifi, who testified in her own defense, stated that she and John moved to California in June 2021, and that she had primarily been taking care of John by herself since December 2021 after he stopped attending school. Vaoifi indicated that she had initially moved because her sister had promised to help and support her but later asked Vaoifi to leave her house within three weeks of arrival. She therefore had a difficult time watching John by herself and was struggling as she was unemployed and had no resources to assist her. Vaoifi also testified that M.H. was not providing her with any financial help or assistance with watching John, even after she requested he retake custody of the child. She was therefore "at her wit's end" in April 2022, and was "crying out for help." When asked, Vaoifi admitted to verbally disciplining John and spanking him on the backside. However, the forehead injury was the result of John bumping his head after trying to do a handstand. She did not recall how John got his remaining

5

injuries. Vaoifi indicated that while she was "in her rant," she realized M.H. was recording her, and she therefore left the house with John.

On cross-examination, Vaoifi initially denied stating she was going to kill or chop up John. However, she later admitted telling the arresting officers that she had told M.H. she "would chop [her] kid up into little pieces and kill him," but claimed she only remembered saying it, not "meaning it." She also admitted telling M.H. she was going to kill John, but "did not mean it," and was simply trying to give M.H. "insight" into her mental state.

## C.    *Relevant Jury Instructions*

At the conclusion of evidence, the judge instructed the jury with CALCRIM No. 1300 regarding criminal threats as follows:

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to John Doe; [¶] 2. The defendant made the threat orally; [¶] 3. The defendant intended that her statement be understood as a threat; [¶] 4. Under the circumstances, the threat was so clear, immediate, unconditional, and specific that it communicated to [M.H.] a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused [M.H.] to be in sustained fear for his own safety or for the safety of his immediate family; [¶] AND 6. [M.H.'s] fear was reasonable under the circumstances."

## II.    DISCUSSION

Vaoifi claims that there was insufficient evidence to support the jury's conviction for criminal threats. Specifically, Vaoifi argues that the evidence presented did not demonstrate beyond a reasonable doubt that: (1) she had the specific intent to convey a threat to kill John; and (2) her statements reflected an immediate prospect of execution.

6

*A.     Applicable Law and Standard of Review*

"In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question … is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  The California Constitution requires the same standard. (*Ibid.*)  "[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  A reviewing court must reverse a conviction where the record provides no discernible support for the verdict even when viewed in the light most favorable to the judgment below.  [Citation.]  Nonetheless, it is the [trier of fact], not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt.  [Citation.]  And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  [Citation.]"  (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

A conviction for criminal threats under section 422 requires proof of five elements: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and

an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228; § 422, subd. (a).)

"The statute provides two alternative means by which the victim's fear could manifest itself—fear for oneself or fear for one's immediate family members." (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201 (*Wilson*).) In other words, while the victim— the "person threatened"—is the one who hears the threat and suffers the "sustained fear," the statute's requirement of "another person" whom the perpetrator slates for "death or great bodily injury" may be the victim *or* the victim's immediate family. (§ 422, subd. (a); see *Wilson, supra*, at pp. 197–199 [defendant properly charged and convicted under § 422 for threatening the victim with death to the victim's children and family]; see also *Ayala v. Superior Court* (2021) 67 Cal.App.5th 296, 301–302 [noting that under § 422, the victim's "sustained fear may be for either his or her own safety or that of his or her immediate family member"].)

"[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422. … [including] subsequent actions taken by the defendant." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

**B.**     ***Substantial Evidence Supported the Conviction for Criminal Threats***

   ***1. Specific Intent***

   "[A] criminal threat is a 'specific and narrow class of communication' and 'the expression of an intent to inflict serious evil upon another person.' [Citations.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) Further, "section 422 does not require an intent to actually carry out the threatened crime. [Citation.] Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that

it would cause a reasonable person to fear for his or her safety *or the safety of his or her immediate family*. [Citation.]" (*Id.* at p. 806, italics added.)

Vaoifi argues that M.H.'s testimony clearly established her lack of specific intent to convey a threat to kill or harm John. Vaoifi contends that M.H.: 1) specifically testified that she never directly threatened to kill John; 2) had only requested Tapia to check on things; and 3) did not believe Vaoifi was serious and told Tapia that she liked to "play games." Vaoifi claims that she only said it "would" look bad for M.H. if she killed John, but did not actually convey her intent to carry out this threat. Further, because M.H. told Tapia that Vaoifi had been saying "off-the-wall stuff" for years, her statements only reflected a capacity to commit harm, but did not convey an actual threat to kill or harm.

In making this argument, Vaoifi cites *In re George T.* (2004) 33 Cal.4th 620 (*George T*) in support, which concluded that expression of a capacity to kill did not necessarily reflect an actual threat to do so. However, *George T.* involved a poem written by the juvenile defendant, which contained statements about the defendant's feelings regarding his fellow students, as well as a final statement that he could be "the next kid to bring guns to kill students at school." (*George T., supra,* at p. 635.) The California Supreme Court concluded that the poem did not rise to the level of a criminal threat because it was "ambiguous and plainly equivocal," and did not describe or threaten any specific future conduct against his fellow students, including the students who he gave the poems to. (*Id.* at pp. 636–637.) In contrast, as discussed in more detail below, we find no similar ambiguity and lack of specificity in the statements made by Vaoifi to M.H. We therefore find Vaoifi's reliance on *George T.* misplaced.

In looking at the whole record in the light most favorable to the judgment, we find that there was substantial evidence to demonstrate Vaoifi's specific intent to convey a threat to kill or harm John. Per M.H.'s testimony, Vaoifi not only told him she could end up killing John or chopping him up, but also indicated that she would harm John if he

9

(M.H.) did not call and talk to her. Vaoifi herself admitted to the officer, and during cross-examination, that she told M.H. she was going to kill John or "chop him up" into little pieces. In addition, per Tapia's testimony description of the video recording M.H. took during the call and which the jury viewed, a hand came up behind John's head, then came down as though it was possibly hitting him. Moreover, M.H. told Tapia that it appeared as though Vaoifi was smothering or choking John. Accordingly, we conclude that Vaoifi's cumulative actions of: (1) threatening harm against John if M.H. did not call and talk to her; and (2) engaging in what appeared to be a physical struggle with John while still speaking to M.H. provided substantial evidence of her specific intent to convey to M.H. her threats to kill or harm John. (See, e.g., *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348 ["There is no reason for appellant to do what he did and say what he said if he had not had the specific intent that the [victims] interpret his actions as a threat"].)

### 2. *Immediate Prospect of Execution*

Vaoifi next argues that there was insufficient evidence that she made an "unconditional, immediate, and specific threat, conveying an immediate prospect of execution." Vaoifi specifically points to M.H.'s conversation with Tapia, where he indicated that it was unnecessary for Tapia to break down the door as the threats were "not that serious," and Vaoifi had been making similar statements for many years. Vaoifi claims that given M.H.'s long and intimate relationship with her, he was more than qualified to assess whether her statements conveyed an immediate threat of execution, and his statements to Tapia therefore reflected that he did not believe John was in immediate danger of harm.

We find no merit to Vaoifi's contention. "Section 422 demands that the purported threat be examined 'on its face and under the circumstances in which it was made.' The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat," and such threats must be "judged in their context." (*In re Ricky T.*

10

(2001) 87 Cal.App.4th 1132, 1137 (*Ricky T.*).)  Here, we find substantial evidence from the circumstances surrounding Vaoifi's statements, as well as M.H.'s reaction to them, to demonstrate that Vaoifi's threats were unconditional, immediate, and specific, and conveyed an immediate prospect of execution.  As discussed above, M.H. testified that he was "very afraid" for John's life, based on his observations of John cowering the background during the call with Vaoifi, as well as the physical struggle that appeared to take place between Vaoifi and John at the end of the call.  He specifically called law enforcement for help because of these concerns.  In addition, M.H. testified that the reason he told Tapia not to break down the door was because he was worried it would be more traumatizing to John, and he "didn't want anything bad to happen."  Further, while Tapia confirmed M.H. told him it was not necessary to break down the door, and things were "not that serious," Tapia also testified that M.H. independently stated he was scared for John's life twice, and was very nervous and rambling throughout the call, which lasted approximately 40 minutes.  In addition to conveying Vaoifi's statements that she was going to kill or chop up John, M.H. told Tapia he saw Vaoifi attempting to smother or choke John with a pillow.  Indeed, Tapia himself confirmed that the video taken, which was viewed by the jury, was "violently shaking"; he further stated that the video depicted Vaoifi cursing and yelling at John, then showed a hand coming up behind John that appeared to hit him.  Moreover, M.H. testified that he had never called the police previously on Vaoifi, yet felt it was necessary to do so because John was in a "bad position" based on him visibly cowering in the video call.  Accordingly, based on Vaoifi's conduct towards John as displayed in the video, combined with M.H.'s statements about being afraid for John and M.H.'s decision to involve the police for the first time, we find there was substantial evidence for a jury to conclude that M.H.: (1) viewed Vaoifi's statements as reflective of an unconditional and specific threat to harm John; and (2) believed there was an immediate prospect of those threats being carried out. (Contra *Ricky T., supra,* at pp. 1137–1138 [finding that defendant's threats that "I'm

11

going to get you" and "I'm going to kick your ass," with no accompanying physical movements, as well as the fact that police were only called until the following day, did not demonstrate an unequivocal threat of harm or immediate prospect of execution].)

In conclusion, viewing the evidence in the light most favorable to the judgment, we find that there was substantial evidence to support the jury's conviction of Vaoifi for criminal threats under section 422, subdivision (a).[4]

### III.    DISPOSITION

The judgment is affirmed.

---

[4] Vaoifi does not appear to directly contest the remaining elements required for criminal threats. Therefore, while we would find substantial evidence in the record to establish those elements as well, we need not address them since they have not been challenged by Vaoifi. Consequently, any such arguments as these elements are forfeited. (*North American Title Company v. Superior Court of Fresno County* (2024) 17 Cal.5th 155, 177–178 [when a party does not raise an objection in the manner required, failure to do so, without more, constitutes a forfeiture].)

 

                                   _____

                                                 Wilson, J.

WE CONCUR:

_____

Danner, Acting P. J.

_____

Bromberg, J.

*People v. Vaoifi*
H051791