Filed 6/2/22 P. v. Landers CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TREVOR GLENN LANDERS,<br><br>    Defendant and Appellant. | B313663<br><br>(Los Angeles County<br>Super. Ct. No. NA075960) |

APPEAL from an order of the Superior Court of Los Angeles County, Judith L. Meyer, Judge. Affirmed.

J. Tony Serra, Tyler Smith, and Erica Treeby for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Trevor Glenn Landers (defendant) appeals the trial court's denial of relief under Penal Code section 1170.95 after an evidentiary hearing.[1]  Because the trial court's findings are supported by substantial evidence, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

## I.    Facts

### A.    *The underlying crime*

In 2007, defendant and his cousin Anthony Vigeant (Vigeant) were United States Marines stationed at Camp Pendleton Marine Base.  In August of that year, they befriended Ramon Hernandez (Hernandez), a fellow Marine who told them about the injuries he had received on his second tour of duty in Iraq.  His injuries were significant:  He had shrapnel inside his brain.  He lost his left eye, his sense of smell, his left frontal lobe and part of his right frontal lobe.  He suffered nerve damage in his right arm and hand.  And his brain injuries affected his thinking, causing him to process information more slowly and diminishing his ability to feel empathy toward others.

Soon after meeting Hernandez, defendant and Vigeant told him that they had a problem with a man named David Pettigrew (Pettigrew).  They explained that defendant had agreed to buy cocaine from Pettigrew, who had taken Vigeant's laptop as security for the upcoming deal, and Pettigrew had yet to produce the cocaine or return the laptop.  Pettigrew was a total stranger to Hernandez.

On the night of September 7, 2007, and early the next morning, Vigeant and defendant called Pettigrew several times in

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

2

Hernandez's presence. Defendant left a message warning Pettigrew that he "better fuckin' call [defendant] back." Vigeant also left messages further warning Pettigrew that "he and [his] cousin" (that is, defendant) were "ready to rumble," that Pettigrew was "fucked if [he] tr[ied] to run" because they "kn[e]w where to find [him]," and were "gonna come to [his] house," where it would "get really ugly."

On September 9, 2007, defendant was again complaining to Vigeant and Hernandez about Pettigrew. At one point, defendant stated that, if he had a gun, "he would bust a cap in [Pettigrew's] ass." Hernandez offered up that *he* had a handgun. Upon hearing this, defendant became "excited, very enthusiastic," asked Hernandez where the gun was located, and indicated that he wanted to retrieve it to shoot Pettigrew.

Because Hernandez's barracks was a 45-minute drive to the south, defendant drove the three of them to retrieve the gun and then turned around and drove two hours north to get to Pettigrew's apartment in Long Beach. During that drive, Hernandez said he did not like that Pettigrew was messing with fellow Marines. He asked defendant and Vigeant what they wanted him to do. Their response? Shoot Pettigrew. When Hernandez pointed out the difference between being shot and being dead, and asked, "Which one do you want?" Defendant clarified, "I want him dead." Defendant indicated at least three times that he wanted Pettigrew killed. In preparation for the confrontation to come, Hernandez loaded his gun and fired it out the car's window.

When they arrived at Pettigrew's apartment, Hernandez again asked defendant to confirm his instructions, "Are you sure this is what you want? If you want this guy dead and he doesn't

3

give you what you want, then I am going to shoot him because you said you want him dead?" Defendant responded that he wanted Pettigrew "Dead."

Defendant climbed a fence to check if they could access Pettigrew's apartment through a window. He came back and told the others they would have to go through the front door. Hernandez did not want to enter the apartment "blind," so defendant drew a "floor plan" for him out of twigs and small rocks.

When the three men entered the apartment, Pettigrew appeared to be asleep or passed out. When he awoke, defendant yelled, "Where is my coke? Where is [Vigeant's] computer? Where is my shit?" Pettigrew offered to call his dealer to get the cocaine, but when Pettigrew placed a call with his cell phone, he called *defendant*'s phone.

At that point, Hernandez pulled out the gun and stated he would give Pettigrew 10 seconds to produce either the laptop or the cocaine. Defendant did not stop Hernandez or tell him to put the gun away. Instead, defendant and Vigeant told Pettigrew to call his dealer "and get the coke here right now" because Hernandez "is going to shoot you" "when he gets to ten." Hernandez counted very slowly, pausing approximately 10 or 15 seconds between each number. When he got to 10, he pulled the trigger and shot Pettigrew from a distance of about four feet. Defendant jumped back and stated, "Dude, you almost got blood on me."

Rather than checking whether Pettigrew was still alive, all three men fled the apartment, ran to the car, and defendant drove away. In total, the three men were inside of Pettigrew's apartment for "no more than 20 minutes."

Defendant drove them back to Camp Pendleton.  Once there, they went to defendant's room and "hung out" for about three more hours drinking.  Defendant told Hernandez that he should have shot Pettigrew two more times to ensure he was dead.  They agreed not to say anything about what happened and to pretend they did not know each other.

### B.  *Charging, conviction, and appeal*

#### 1.  *Charges*

In the operative, first amended information, the People charged defendant and Vigeant with the first degree murder of Pettigrew (§ 187, subd. (a)), attempted home invasion robbery (§§ 664, 211), and first degree residential burglary (§ 459).  As to the murder, the People alleged the special circumstance that defendants "were engaged in the attempted commission of the crime of robbery" and "in the commission of the crime of residential burglary" (§ 190.2, subd. (a)(17)).  As to all three crimes, the People further alleged that "a principal was armed" during those crimes (§ 12022, subd. (a)).

#### 2.  *Trial and conviction*

Hernandez ended up pleading to all counts without a plea agreement, but agreed to testify for the prosecution.

The matter proceeded to a joint jury trial against defendant and Vigeant.[2]  The jury convicted defendant of first degree murder, attempted home invasion robbery, and first degree residential burglary.  The jury found true the special

---

[2]     This was a retrial for defendant.  Defendant's first trial had been severed from Vigeant's due to a scheduling conflict.  That jury hung.

circumstance allegation and made true findings on the firearm enhancement.

### 3.    *Sentence*

Defendant was sentenced to an indeterminate term of life without the possibility of parole, plus a determinate term of 66 months in state prison.[3]

### 4.    *Appeal*

Defendant appealed his conviction and we affirmed his conviction in an unpublished opinion.

## II.    Procedural Background

On February 18, 2020, defendant filed a petition for writ of habeas corpus seeking relief identical to that available under section 1170.95, and the trial court construed it as a petition for resentencing under section 1170.95.

In December 2020, the trial court summarily denied the petition.

In February 2021, however, the court granted defendant's motion to reconsider the denial and set an evidentiary hearing on the petition.  The court held the hearing in May 2021.  Defendant took the stand, testifying that it was Hernandez's idea to get the gun and to shoot Pettigrew for disrespecting fellow Marines, that defendant never asked Hernandez to shoot Pettigrew, and that Hernandez "took control" of the situation in Pettigrew's apartment, rendering defendant and Vigeant powerless to intervene despite their earnest desire that Hernandez *not* harm Pettigrew.

After taking the matter under submission, the court issued a five-page order denying defendant's petition.  After reviewing

---

[3]    Vigeant was convicted of the same crimes as defendant and received an identical sentence.

6

the factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the court found that defendant "was both a major participant and had reckless disregard for human life" and "that, the prosecution [ ] established [defendant's] guilt" under a still-viable theory of liability "beyond a reasonable doubt."

Defendant filed this timely appeal.

## DISCUSSION

### I.    Provisions of Section 1170.95

A person makes a prima facie case for relief under section 1170.95—and thus to have a murder conviction "vacated"—if, as relevant here, they allege that (1) "[a] complaint, information, or indictment was filed against [him] that allowed the prosecution to proceed under a theory of felony murder[ or] murder under the natural and probable consequences doctrine," (2) he "was convicted of murder," and (3) he "could not presently be convicted of murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).) The changes made effective on January 1, 2019 allow a murder conviction to stand only if a defendant (1) is the actual killer, (2) aided and abetted the actual killer with the intent to kill, or (3) otherwise acted as a major participant in an underlying felony and acted with reckless indifference to human life, or similar form of implied malice. (§§ 188, 189, subd. (e); *In re Scoggins* (2020) 9 Cal.5th 667, 674.) What these changes did is codify our Legislature's intent that "[a] person's culpability for murder [is to be] premised upon that person's own actions and subjective mens rea" (Stats. 2018, ch. 1015, § 1(g)), such that the "[m]alice" necessary to convict a person of murder "shall not be imputed to a

7

person based solely on his . . . participation in a crime." (§ 188, subd. (a)(3).)

Once this prima facie case is made, a trial court must issue an order to show cause and hold an evidentiary hearing. The question at the evidentiary hearing is whether, in the trial court's independent opinion, the evidence presented at the defendant's original trial as well as any further evidence the parties present at the evidentiary hearing, establishes the defendant's guilt of murder under a still-viable theory beyond a reasonable doubt. (§ 1170.95, subd. (d)(3).)

## II. Analysis

Because the trial court independently found defendant guilty of murder because he was a major participant in Pettigrew's killing who acted with a reckless indifference to human life, and because that theory of liability is still viable, the primary question in this appeal is whether that finding is supported by substantial evidence.[4] (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 985; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 113.) As explained below, it is.

---

[4] The People alternatively urge that the trial court erred in granting an evidentiary hearing in the first place because the jury's special circumstance finding amounts to a finding that defendant was a major participant who acted with reckless indifference. Defendant responds that the jury's finding is not a bar to relief under section 1170.95, however, because that finding was rendered before the California Supreme Court narrowed the scope of that special circumstance in *Banks* and *Clark*. We need not address whether relief could have been denied at the outset because we ultimately conclude that relief was properly denied after the evidentiary hearing.

8

In undertaking substantial evidence review, our task is a narrow one.  We may only ask whether the record contains "substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)  In so doing, we must view the record "in the light most favorable" to the trial court's finding.  (*Ibid.*)  Critically, we may not reweigh the evidence (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890); as long as the trier of fact's resolution of any conflict in the evidence is "reasonable," we cannot reverse just because the trier of fact could have reasonably resolved the conflict the other way (*Hubbard*, at p. 392).

Thus, we turn to examining whether substantial evidence supports the trial court's subsidiary findings that defendant was a major participant in the underlying felony and acted with reckless indifference to human life, as those elements were narrowed under *Banks* and *Clark*.

### A.     *Major participant*

Under *Banks* and *Clark*, a "major participant" in a burglary or attempted robbery is someone whose "personal involvement" is "substantial"; such a participant "need not be the ringleader," but his involvement must be "greater than the actions of an ordinary aider and abettor."  (*Banks*, *supra*, 61 Cal.4th at pp. 801-802; *People v. Williams* (2015) 61 Cal.4th 1244, 1281.)  Courts are to examine the totality of the circumstances when evaluating the extent of participation, including several factors our Supreme Court identified in *Banks* as relevant but not dispositive on the issue: (1) the defendant/aider and abettor's role in planning the robbery; (2) his role in supplying or using lethal weapons; (3) his

9

awareness of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) his presence at the scene of the killing and thus whether he was "in a position to facilitate or prevent the actual murder"; and (5) his actions after the use of lethal force. (*Banks*, at p. 803; *Clark*, at p. 611.)

Substantial evidence supports the finding that defendant was a major participant, even when applying the heightened standard set forth in *Banks* and *Clark*.

First, defendant played the lead role in planning the robbery/burglary—he was "excited" and "very enthusiastic" when Hernandez revealed he had a handgun; he asked where it was and how he could get it; he drove the car to get the handgun and he drove to and from Pettigrew's apartment in Long Beach; he repeatedly told Hernandez he wanted Pettigrew dead while they were driving to Pettigrew's apartment; and he scoped out Pettigrew's apartment and drew a floor plan for Hernandez.

Second, defendant played a major role in obtaining the weapon used. He recruited Hernandez to get his handgun; he drove 45 minutes to get the gun, in the opposite direction of Pettigrew's apartment; he saw the gun and heard Hernandez test it while driving to Pettigrew's apartment; and he did nothing to dissuade Hernandez from bringing it into Pettigrew's apartment.

Third, defendant was aware of the particular dangers posed by the nature of the crime and the participants. Hernandez told defendant about his combat history and physical and psychological injuries; the plan involved robbing and burglarizing a drug dealer; defendant knew Hernandez was armed; and defendant repeatedly affirmed that he wanted Pettigrew dead if he did not get his cocaine. Given that defendant repeatedly

10

stated his plans in front of Hernandez and saw how Hernandez eagerly supported him in those plans and how Hernandez then asked for specific instructions on whether to kill or just maim Pettigrew, the evidence also supports the inference that defendant was aware that Hernandez was very suggestible.

Fourth, defendant was at the scene of the killing and did not intervene in any way to stop Hernandez from shooting Pettigrew even though he was so close that blood from Pettigrew's head wound almost splattered him.

Fifth, and finally, defendant did not render any aid to the victim. Instead, he drove the car that fled the scene; he stopped to get some food on the drive back to Camp Pendleton; he "hung out" with his cohorts for a few hours after they got back to base; and he told Hernandez he should have shot Pettigrew two more times to ensure he was dead.

Defendant offers two related arguments against this conclusion. First, he argues that the evidence upon which the prosecution relied and upon which the jury convicted him— Hernandez's testimony—was "inconsistent, unreliable, and undercut by new evidence" defendant presented at the evidentiary hearing. The "new evidence" defendant proffered included: (1) transcripts of police interviews with both the defendant and Hernandez, (2) two letters Hernandez wrote to defendant's brother more than four years after the murder, and (3) the trial transcript from defendant's first trial. At most, this new evidence provides some fodder for impeaching Hernandez's trial testimony with additional inconsistencies, and some support for the notion that defendant's statements to police and his testimony at the first trial were consistent with one another. However, this additional impeachment evidence does not call into

11

question the jury's implicit conclusion that Hernandez was a credible witness. Under the substantial evidence standard, we cannot gainsay the jury's credibility finding. (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

Second, defendant takes issue with the trial court's analysis of the specific *Banks* factors bearing on major participation, arguing that (1) defendant's role was minimal and he did not recruit Hernandez or seek out his assistance; (2) he "played no role in supplying or using the gun"; (3) he was "unaware of Hernandez's violent or hair-trigger temper"; (4) he was not in a position to stop the shooting from occurring because "Hernandez took complete control of the situation and pushed [defendant] . . . out of the way"; and (5) defendant was in a "state of shock" after the shooting, which was consistent with "someone completely surprised by what had occurred." But, as noted above, the evidence adduced at trial contrasted sharply with defendant's testimony at that evidentiary hearing. At bottom, defendant is asking us to reweigh the conflicting evidence—that is, the evidence presented to (and accepted by) the jury versus *his* testimony. The trial court went with the evidence presented to the jury over defendant's self-serving testimony at the section 1170.95 hearing; we cannot reweigh the evidence to come to a different conclusion.

### B.    *Reckless indifference to human life*

Under *Banks* and *Clark*, a defendant acts with reckless indifference to human life when he ""'knowingly engag[es] in criminal activities known to carry a grave risk of death.'"" (*Banks*, *supra*, 61 Cal.4th at p. 801, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 577, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157-158.) This standard "has a subjective

and an objective" component. (*Scoggins*, 9 Cal.5th at p. 677.) To satisfy the subjective component, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the [underlying felony] is committed,' and . . . must consciously disregard 'the significant risk of death his or her actions create.'" (*Scoggins*, at p. 677, quoting *Banks*, at p. 801.) The key is whether the defendant evinces "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) To satisfy the objective component, the risk of death "'"must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to him[], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant's] situation."'" (*Scoggins*, at p. 677, quoting *Clark*, at p. 617.)

Our Supreme Court has identified a number of considerations bearing on whether a defendant has acted with reckless indifference to human life. "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks*, *supra*, 61 Cal.4th at p. 803); what matters is the totality of the considerations (*Scoggins*, *supra*, 9 Cal.5th at p. 677). The considerations are: (1) "Did the defendant use or know that a gun would be used during the [underlying] felony," and, relatedly, "[h]ow many weapons were ultimately used?"; (2) "Was the defendant physically present at the crime," such that he had "the opportunity to restrain the crime or aid the victim?"; (3) "What was the duration of the interaction between the perpetrators of the [underlying] felony and the victims?"; (4) "What was the defendant's knowledge of . . . his confederate's

13

propensity for violence or likelihood of using lethal force?"; and (5) "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Id.*, citing *Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

Substantial evidence supports the finding that defendant acted with reckless indifference to human life, even when applying the heightened standard set forth in *Banks* and *Clark*. First, although defendant did not personally use the gun, he knew Hernandez was armed with a gun and knew he had confirmed with Hernandez multiple times earlier in the night that he wanted Pettigrew dead. Second, defendant was present during the shooting and close to Pettigrew and the shooter. Additionally, defendant was present and heard Hernandez during the prolonged count to ten and did not try to stop or dissuade him from shooting Pettigrew. Third, the entire incident took approximately 20 minutes, most of which was spent demanding cocaine from Pettigrew before Hernandez shot him. Fourth, defendant was aware of Hernandez's combat record consisting of two tours in Iraq and the injuries he suffered, and confirmed multiple times during the night that he wanted Pettigrew killed. Fifth, and finally, defendant made no effort to minimize the risk of violence, he did not tell Hernandez to leave the gun in the car, he did not tell him to put the gun away, and he did not interrupt Hernandez when Hernandez began counting to ten which defendant knew was the precursor to shooting Pettigrew.

Defendant's response to this second element of the special circumstances is essentially the same as his responses to the first element, and lacks merit for the same reasons.

\*       \*       \*

14

Suffice it to say, the record supports the trial court's implicit factual finding that defendant manipulated a brain-damaged veteran into burglarizing and shooting defendant's cocaine dealer by suggesting a motive to shoot the dealer, lamenting about not having a gun, and repeatedly telling the veteran that the goal was to kill the dealer rather than scare or maim him. In so doing, defendant was a major participant in the underlying crimes and acted with reckless indifference to human life.

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ