Filed 6/18/24  P. v. Washington CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B331427 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA081613) |
| v. | |
| JUSTIN MARCEL WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Amy N. Carter, Judge.  Affirmed.

Noriega Law Firm and Lauren Noriega for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an amended information filed by the Los Angeles County District Attorney's Office, defendant and appellant Justin Marcel Washington was charged with premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1).[1]  It was alleged that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d) & (e)(1)).  It was further alleged that defendant committed his crime for the benefit of a criminal street gang with the intent to promote, further, and assist that criminal street gang (§ 186.22, subd. (b)(1)), and that he personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)).  Finally, it was alleged that defendant had suffered a serious or violent felony conviction (§§ 667, subds. (a)(1) & (b)-(i), 1170.12, subds. (a)-(d)).

Pursuant to a negotiated plea agreement, defendant pleaded guilty to the sole count and admitted that a principal personally and intentionally discharged a firearm.  The remaining allegations were dismissed.  Defendant was sentenced to an upper term of nine years plus an additional 10 years pursuant to section 12022.53, subdivisions (c) and (e)(1).

On March 10, 2021, defendant filed a petition to recall his sentence pursuant to section 1172.6.[2]  Following briefing and an

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Defendant actually filed his petition pursuant to section 1170.95.  Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  For simplicity, we refer to the section by its new numbering.

evidentiary hearing, the trial court denied the petition, and defendant appeals.

We affirm.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

A. <u>The victim is shot</u>

Gardena Police Department (GPD) Lieutenant Alexander Rivera investigated a shooting that occurred in Rowley Park on June 29, 2011.  Rowley Park is claimed by the Shotgun Crips gang as its territory.  One of the rivals is the 60's Crips.  Rowley Park has four or five cameras that are controlled and operated by GPD.  Lieutenant Rivera had the relevant surveillance video pulled and booked into evidence.[3]

At 7:41:14, defendant and DeAnthony Davis (Davis) can be seen in the video.  At 7:41:49, they got into a fistfight with two individuals at the eastside of the parking lot.  After the two individuals got in their car and started to leave, defendant chased the car on foot for another 20 to 30 feet.

At 7:44:59, defendant and Davis were seen walking through the basketball courts, where people were playing basketball.  They then left the park.

Minutes later, defendant Davis returned to the park in a car.  Defendant, who was about a foot or two ahead of Davis, approached Khary Malone (Malone) and a verbal altercation occurred.  Specifically, defendant shoulder bumped Malone and asked him and his companions where they were from.  They replied, "'[w]e don't bang.'"  Defendant responded, "'So way [*sic*.]

---

[3]     The video was played at the evidentiary hearing.

Shotgun Crip." Davis then came from behind defendant, pulled out a gun, and fired at Malone, hitting him in the left side of his jaw.

B. Evidence of gang affiliation

Officers executed search warrants of defendant's and Davis's residences, as well as Davis's phone. Officers found gang paraphernalia inside defendant's bedroom, including a folder that had gang graffiti on it. A photo recovered from Davis's phone showed defendant and Davis shirtless; both had gang tattoos. They also recovered a shirt from Davis's residence containing "S" and "G" for Shotgun Crips, along with "Rowley Park" and various cliques of the gang. During a call that Davis made from jail, he said that he got into an altercation with someone from 60's,[4] a rival gang, and that he would be in jail for a long time.

C. Police interview with Davis

GPD Detective Roberto Rosales interviewed Davis.[5] Davis stated that he was no longer in a gang. He also said that he walked to the park. Davis also claimed the shooting was accidental, swearing that he did not mean to do it. Davis also told Detective Rosales that he was alone at the time of the shooting. At that point, because he had already seen the park video, Detective Rosales knew that Davis's statements were untrue, leading him to conclude that Davis was covering for defendant.

---

[4] There was no evidence that Malone was affiliated with a gang.

[5] An audio recording of the interview was played at the evidentiary hearing.

4

## II. *Defense Evidence*

Davis testified that he went to the Rowley Park on June 29, 2011, and defendant arrived after him. In fact, Davis did not know that defendant would be there.

In the first altercation, Davis was knocked unconscious. After he regained consciousness, he and defendant walked 20 feet from the park and then returned.

Davis further testified that defendant was not involved in the first altercation. Because defendant was not involved in the first fight, he did not know anything had happened, and Davis did not tell him what had just happened. But, after viewing the video of the first altercation, Davis acknowledged that he was with defendant at the time. He also acknowledged that defendant had chased after the men after they got in the car.

Defendant and Davis then got into a car to leave the park. As they were leaving, Davis saw someone he knew in the park, so he and defendant got out of the car. Defendant, who did not know the person in the park, was walking ahead of Davis. Davis did not know why defendant got out of the car and was walking in front of him. They had no conversation about getting out of the car or walking back to the park. But, after being shown the video, Davis acknowledged that a car can be seen parking by the basketball courts as he and another man got out of the car.

Before the second incident, defendant and Davis had no conversation about anyone having a gun. He further testified that defendant was standing 15 to 20 feet in front of him during the second incident. Davis did not remember if defendant had any contact with the victim (Malone) in the second incident. When shown the video of defendant confronting and shoulder

5

bumping Malone, Davis invoked his Fifth Amendment right to silence.

Defendant did not use a firearm in the second altercation, and he did not let Davis know of any weapons present in the park. When asked if anyone used a firearm in the second incident, Davis asserted his right to silence.[6] When asked to identify himself and defendant on the video prior to the second incident, Davis again invoked his right to silence. Davis had the same response when asked whether he saw himself approaching Malone, and whether the video captured the shooting that occurred.

When interviewed by the police a few days after the incident, Davis told the police that defendant was not involved.

Defendant did not testify.

## PROCEDURAL BACKGROUND

On March 10, 2021, defendant filed a petition to recall his sentence pursuant to section 1172.6. Over the People's opposition, the trial court issued an order to show cause and set the matter for an evidentiary hearing.

The parties filed prehearing and posthearing briefs.

After listening to the evidence[7] and entertaining oral argument, the trial court denied defendant's petition. First, the

---

[6]  Davis invoked his right to silence in response to numerous questions regarding the shooting.

[7]  As part of its evidence, the prosecution submitted a compact disc with various folders, the "fourth [of] which had the preliminary hearing transcript." The trial court indicated that it had "the original transcript of the preliminary hearing" and "that is what I will be considering."

6

trial court summarized the evidence: "The evidence presented at the hearing established proof beyond a reasonable doubt of the following facts: During the evening hours of June 29th, 2011, [defendant and] . . . Davis[] committed two separate violent attacks, minutes apart, at Rowley Park in Gardena, both of which were captured on surveillance video. Prior to the first of these two assaults, [defendant and] Davis can be seen on the surveillance footage walking in the parking lot at the location, and either grasping hands or handing off an object as they walked. Defendant . . . , wearing a dark colored shirt, can be seen on the video pointing at the victims of the first attack, after which [he] and his co-perpetrator walk toward the victims. [Defendant] pushes and then strikes a victim in a white shirt, immediately after which a physical altercation involving [defendant] and Davis against a pair of males erupts. When the pair of assault victims leave the location in their car, [defendant] can be seen following along on foot as the car pulls away, repeatedly punching the passenger side of the outside of the car.

"[Defendant] and Davis then left the location, only to return approximately five minutes later, walking onto a basketball court within Rowley Park, where [defendant] confronted . . . Malone. Malone had gone to the park to play basketball with his cousin and two friends. [Defendant] shoulder-bumped Malone and asked him, 'Where are you from?' Malone replied, 'We don't bang.' [Defendant] said, 'So way [*sic.*] Shotgun Grip.' Davis then stepped forward and shot Malone in the face in the area of the left jaw. The bullet entered Malone's chin and exited below his earlobe. As shown on the surveillance video, [defendant] is standing behind . . . Davis when the shot is fired, and [defendant] can be seen on the video briefly patting or

7

tapping Davis on the lower back in a swatting motion away from [defendant's] body immediately before they both [ran] away from the crime scene, in a gesture that appears to communicate to Davis that it is time to go. Malone identified [defendant] and . . . Davis at the preliminary hearing."

The trial court then determined that the motivation for the attacks was defendant and Davis's gang membership, namely their gang's claim to Rowley Park as part of its territory: "Detective Toshio Hirai testified at the [p]reliminary [h]earing as a gang expert . . . . [T]he testimony by Det. Hirai that he had two prior contacts with [defendant], that [defendant] admitted to membership in the Shotgun Crips gang, and his tattoos reflected membership in the Shotgun Crip gang, all remain admissible post-[*People v.*] *Sanchez* [(2016) 63 Cal.4th 665]. Also admissible post-*Sanchez* is Det. Hirai's testimony . . . that the criminal street gang known as the Shotgun Crips, in existence since the 1970's, claims Rowley Park as their territory and their 'main area,' as well as Det. Hirai's opinion that asking a victim, 'Where are you from?[,]' shouting out the name of the Shotgun Crips gang and then shooting the victim in the face benefit and further the gang in claiming their territory."

The trial court found Davis's testimony not credible: "The testimony given by . . . Davis lacked credibility. The testimony given by Davis was internally inconsistent, was inconsistent with his prior recorded statements made to Gardena Police Department Detective Roberto Rosales, and was directly contradicted by the video evidence."

Finally, the trial court concluded that the evidence presented at the hearing established a coordinated attack on the behalf of both defendant and Davis: "The video footage of the

8

shooting and the attack that preceded it is compelling evidence of coordinated teamwork on the part of [defendant] and Davis. This court rejects as unreasonable the inference that the sequence of events involving victim selection and identification, followed immediately by a violent attack, twice repeated, was anything other than a coordinated plan. [Defendant] gave clear signals to his co-perpetrator that he had selected two separate victims, first by pointing at a victim, and second by shoulder-bumping a victim and asking, 'Where you from?' and announcing the gang membership [that defendant] shared with his co-perpetrator. Each of these signals of victim-selection was followed swiftly by a violent attack. This pattern was executed twice in succession, merely minutes apart. The only reasonable inference to be drawn from the totality of the evidence presented at the . . . [s]ection 1172.6(d)(3) hearing is that [defendant] knew of . . . Davis's intent to shoot the victim, and [defendant] specifically intended to, and did in fact, aid, facilitate, promote, encourage, and instigate the commission of the attempted murder.

"The People having proved beyond a reasonable doubt that [defendant] is guilty of attempted murder as a direct aider and abettor under current law, his petition filed under . . . [s]ection 1172.6 . . . is DENIED."

## DISCUSSION

I. *Relevant law*

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with

9

reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Effective January 1, 2022, the Legislature enacted Senate Bill No. 775 (2021-2022 Reg. Sess.) to include convictions of "attempted murder under the natural and probable consequences doctrine." (Stats. 2021, ch. 551, § 2.)

"To accomplish this objective, Senate Bill No. 1437 . . . amended section 188, defining malice." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 950.) Specifically, Senate Bill No. 1437 and its amendment to section 188 require "that a principal 'act with malice aforethought' in order to be convicted of [attempted] murder." (*Vargas*, *supra*, 84 Cal.App.5th at p. 950.) Malice may not be imputed to a person based solely on his participation in a crime. (*Ibid*.) "Senate Bill 1437 [did] not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought. [Citation.]" (*People v. Gentile* (2020) 10 Cal.5th 830, 848, superseded by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

Senate Bill No. 1437 also created section 1172.6, which "provides a mechanism whereby people 'who believe they were convicted of [attempted] murder for an act that no longer qualifies as [attempted] murder following the crime's redefinition . . . may seek vacatur of their . . . conviction and resentencing by filing a petition in the trial court.' [Citation.]" (*People v. Arnold* (2023) 93 Cal.App.5th 376, 382.)

In order to obtain resentencing relief, the petitioner must file a facially sufficient section 1172.6 petition. (§ 1172.6, subds. (a)(1)-(3) & (b)(1)(A).)

If the trial court determines that the petitioner has made a prima facie showing of entitlement to relief, it must issue an

order to show cause and hold an evidentiary hearing.  (§ 1172.6, subd. (c).)  At the evidentiary hearing, the parties may rely upon evidence in the record of conviction or new evidence to demonstrate whether the petitioner is eligible for resentencing.  (§ 1172.6, subd. (d)(3).)  The prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is ineligible for resentencing."  (§ 1172.6, subd. (d)(3).)  Only if the prosecution cannot meet its burden is the petitioner entitled to vacatur of the murder conviction and resentencing as set forth in section 1172.6, subdivision (e).

II.  *Standard of review*

We review the trial court's order for substantial evidence.  (*People v. Vargas*, *supra*, 84 Cal.App.5th at p. 951.)  Applying this standard of review, we may only ask whether the appellate record contains "evidence that is reasonable, credible, and of solid value . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)  In so doing, we view the record "in the light most favorable" to the trial court's finding.  (*Ibid.*)  Critically, we may not redetermine the credibility of witnesses nor reweigh any of the evidence.  (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 352; *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

III.  *Substantial evidence supports the trial court's order*

Ample evidence supports the trial court's finding that defendant acted as an aider and abettor with actual malice.  (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 ["Aiding and abetting may be shown by circumstantial evidence.  It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the

11

offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime"].)

Specifically, the sequence of events supports the inference that the two men intended to engage in a fatal coordinated violent gang attack on a suspected rival[8] that involved defendant selecting their victim and announcing their gang affiliation while Davis acted as the shooter in an attempt to murder the suspected rival. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 ["'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction'"].) First, defendant and Davis engaged in a fight that ended with the victims driving away as defendant continued to chase them, punching their car as they drove away. The two men then continued to assert their gang dominance over the park by walking through the basketball courts as people were playing.

Minutes later, defendant initiated a confrontation by shoulder bumping Malone, asking Malone and his companions which gang they were from, and then responding by announcing Shotgun Crips. Davis then immediately came from behind

---

[8]    The evidence established that both men were Shotgun Crips and that they were claiming Rowley Park as part of their territory. While defendant's mere membership in the gang would be insufficient to establishing aiding and abetting, his gang affiliation, companionship with Davis, and conduct before and after the offense were relevant factors in determining aider and abettor liability. (See *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 940–941; *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1342, overruled on other grounds in *Santamaria v. Horsley* (9th Cir. 1998) 138 F.3d 1280.)

12

defendant, pulled out a gun and fired at Malone, hitting him in the left side of his jaw. From these "facts and circumstances" (*People v. Pre* (2004) 117 Cal.App.4th 413, 420), the trial court reasonably inferred that defendant and Davis intended their coordinated gang attack to be a fatal one, with defendant taking the lead role in selecting the victim and initiating the attack and Davis playing the role of the shooter.[9]

Urging us to reverse, defendant characterizes the evidence differently. He argues that "[t]he evidence is clear that a plan may have existed to assault individuals at the park, or to assert their dominance as gang members against people at the park, perhaps even assault or commit battery against people at the park. However, these offenses do not demonstrate the intent to aid and abet attempted murder." In so doing, he relies heavily upon Davis's testimony. But the trial court rejected Davis's testimony as not credible.[10] (*People v. Harden* (2022) 81 Cal.App.5th 45, 51 [at a subd. (d)(3) evidentiary hearing, the court may make factual findings and credibility determinations, and weigh evidence].) We cannot, and will not, redetermine

---

[9] The fact that no firearm was found during the search at defendant's home or that there is no evidence that defendant was involved in Davis's procurement of a firearm does not compel a different result.

[10] Defendant also directs us to an apology letter written by Davis to Malone in which, according to defendant, Davis takes sole responsibility for the shooting. But the trial court was free to disregard defendant's interpretation of Davis's letter. Even if we agreed with defendant's characterization of the letter, in light of the other evidence of his and Davis's coordinated attack on Malone, the letter is insufficient to compel reversal of the trial court's order.

13

Davis's credibility, especially here given that his testimony was riddled with inconsistencies and contradictions.

Defendant further claims that the trial court's rejection of Davis's testimony was insufficient to prove that he acted as an aider and abettor. (See *People v. Lara* (2017) 9 Cal.App.5th 296, 319 ["While the jury was not required to accept [the defendant's] account of events, 'merely disbelieving' him does not amount to 'evidence' [that the defendant] was in fact the shooter, or if the jury did believe [that another man] was the shooter, that [the defendant] willfully, deliberately, and with premeditation, aided and abetted in the murderous act"].) While we do not disagree with defendant's statement of the law, it does not apply here. As set forth above, there was sufficient evidence that defendant and Davis engaged in an orchestrated and coordinated attack on Malone.

And to the extent defendant asks us to interpret the evidence differently—to support his narrative—we decline to do so. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245 ["We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party"].)

*People v. Reyes* (2023) 14 Cal.5th 981 does not compel a different result. In *Reyes*, our Supreme Court held that a defendant was entitled to a second evidentiary hearing because the trial court misunderstood the legal requirements of implied malice murder. (*Id.* at p. 992.) Not so here. As set forth in its order, the trial court correctly understood the law and applied it by finding that defendant (1) knew of Davis's intent to shoot the victim, and (2) specifically intended to, and in fact did, aid,

14

facilitate, promote, encourage, and instigate the attempted murder.  (*People v. Powell* (2021) 63 Cal.App.5th 689, 712.)

**DISPOSITION**

The order denying defendant's section 1172.6 petition is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ