Filed 8/26/25  P. v. Torres CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ENRIQUE TORRES,<br><br>    Defendant and Appellant. | G062957<br><br>(Super. Ct. No. 21WF1284)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge. Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

A jury convicted defendant Enrique Torres of one count of second degree murder (Pen. Code, § 187, subd. (a)).[1] The jury also found true that defendant personally used a firearm during the commission of the murder (§ 12022.5, subd. (a)) and personally discharged a firearm causing death (§ 12022.53, subd. (d)).

The court sentenced defendant to state prison for a total term of 40 years to life as follows: (1) 15 years to life for the murder; and (2) 25 years to life on the firearm enhancement (§ 12022.53, subd. (d)).

Defendant raises two arguments on appeal. First, he argues his second degree murder conviction should be reversed because there was insufficient evidence to disprove voluntary manslaughter. Second, he contends the court erred by admitting gang-related evidence in violation of his due process rights.

For the reasons below, we disagree with defendant's contentions and affirm the judgment.

FACTS

I.

THE MURDER

In January 2021, the victim, Geovanni V., and two females arrived at the Hyatt Regency hotel in Garden Grove to attend a party around 3:45 a.m. The victim and Geovanni V. were part of a party crew called "United Pot Smokers." Both had been drinking, and Geovanni V. was intoxicated when they arrived. Geovanni V. was wearing a blue beanie.

As they walked towards the hotel lobby, they encountered defendant, Agustin C., who was wearing a sweatshirt bearing a "CK" logo,

_____

[1] All further statutory references are to the Penal Code.

2

and two other men walking towards the exit. Surveillance video captured the ensuing incident and was played for the jury.

According to witness testimony, the victim, Geovanni V., and defendant's group were "[m]ad dogging" each other—i.e., exchanging "bad looks." After someone from defendant's group said something, which a witness characterized as a "hit-up," the victim and Geovanni V. approached defendant's group. Their verbal exchange involved mutual posturing. Members of both groups "were hitting each other up[,]" which meant they asked where the others were from or what "[c]rews" they claimed. The victim said he was from Santa Ana, and defendant, the most aggressive member of his group, said they were from "Muertos" or "Los Muertos." He further argued with Geovanni V. and said "Fuck crackheads" to the victim. The victim told defendant's group that they did not want any trouble and were trying to have a good night. The victim and Geovanni V. then shook hands with defendant's group and walked away.

Shortly after, someone in defendant's group said, "'Fuck Crips,'" which referred to a rival of the Muertos gang, and "'[y]our crew is lame.'" The victim and Geovanni V. then turned back towards defendant's group. Geovanni V. approached Agustin C. who appeared to raise his hands, and the two engaged in a physical fight. During the fight, the victim quickly set a carton of beer on the ground. As he leaned over, defendant removed a gun from his pocket. The victim then stood up, rushed towards Agustin C., and appeared to lift his sweatshirt at the front waistband. At that moment, defendant fired a gun at the victim, shooting him in the head.

Defendant and his group fled the scene. Police found the victim on the ground and a pair of pliers underneath his stomach or waistband. The victim later died from the gunshot wound.

## II.

## DEFENDANT'S STATEMENTS TO POLICE

During a search of defendant's residence in May 2021, law enforcement found two notebooks with gang indicia, including the writing "MTS." In his interview with police, defendant admitted he had associated with the Muertos gang but claimed he was no longer a member. He explained he was "jumped" into the gang when he was around 14 years old and associated with them because they lived in the same neighborhood. He also displayed his gang-related tattoos, which he claimed were over a year old. When asked how he would respond if someone were to say, "Fuck Muertos," defendant indicated he would not react. Defendant further acknowledged Muertos did not get along with the Crips gang.

Regarding the incident, defendant initially denied any involvement in the shooting or traveling to Orange County. He later admitted he was present for "the murder" and accused Agustin C. as being the shooter. After police disclosed surveillance footage of the shooting to defendant, he admitted to being the shooter and responded, "Something I regret very much." He described the event as the "biggest mistake" of his life. He also stated he initially lied because he was afraid he would never see his daughter again.

When describing the events leading up to the shooting, defendant stated everyone started fighting and that he was not trying to kill the victim. But they got into an argument, and defendant stated he had beer and drugs in his system. He shot the victim because "there was a brawl[,]" and he was "trying to defend [his so-called] family." When asked about the gun, defendant said someone else gave it to him for everyone's safety and that he threw the gun away in the ocean after the shooting.

## III.

### GANG EVIDENCE

The prosecution's gang expert testified about the Muertos gang. He explained Muertos is a turf-oriented gang from Los Angeles County that tries to take control of a particular area. He did not believe Muertos had any turf in Orange County or rivals in Garden Grove. A primary rival of the Muertos gang was the Crips gang. According to the expert, if a Muertos gang member said, "Fuck Crips," it would be considered a disrespectful term and sign of aggression.

The expert also generally testified about respect in gang culture. He noted respect "is their honor" and is associated with fear and intimidation. He explained gangs rely on fear instilled through criminal acts to maintain their status and deter others from cooperating with law enforcement. When asked what the term "family" means in gang culture, the expert testified, "[G]ang members see their gang and their fellow gang members as their family."

The expert further explained the term "hit up" in gang culture, which means asking someone where he or she is from to determine the person's gang affiliation. Failing to respond by claiming one's gang is viewed as a sign of weakness. The expert noted gang identity may be expressed verbally or through tattoos, hand gestures, graffiti, and clothing. As to clothing, the expert noted gang members use different clothing brands or specific colors to express their gang affiliation. For example, he explained Crips members wear blue and that some gangs wear Calvin Klein clothing with a "CK" logo, which can mean "Crip killer."

5

DISCUSSION

Defendant argues the evidence was insufficient to disprove voluntary manslaughter. He also claims the trial court abused its discretion by admitting gang-related evidence. Neither contention has merit.

I.

SUBSTANTIAL EVIDENCE SUPPORTED THE MURDER CONVICTION

Defendant argues his second degree murder conviction violates his due process rights because there was insufficient evidence to disprove voluntary manslaughter. To the contrary, substantial evidence supports the jury's implicit finding that defendant did not kill the victim in imperfect self-defense or out of a heat of passion.

*A.  Applicable Law and Standard of Review*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

Manslaughter is an unlawful killing without malice. (§ 192.) A homicide that would otherwise be murder may be reduced to voluntary manslaughter if the defendant acted in imperfect self-defense or was provoked in a sudden quarrel or heat of passion. (*People v. Elmore, supra*, 59 Cal.4th at p. 133.)

"Where, as here, a defendant challenges the sufficiency of the evidence on appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence— evidence that is reasonable, credible, and of solid value—such that a

6

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.) "[I]t is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt." (*Ibid.*) "[W]hether the prosecutor relied upon direct or circumstantial evidence . . . reversal is not warranted, even where "'the circumstances might also reasonably be reconciled with a contrary finding.'"" (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

B. *Imperfect Self-Defense*

According to defendant, there was insufficient evidence to disprove he acted in imperfect self-defense of himself or Agustin C. We disagree.

"Imperfect self-defense arises when a defendant acts with a subjectively honest but objectively unreasonable belief that he or she is in imminent danger of death or great bodily injury." (*People v. Temple* (2025) 110 Cal.App.5th 1281, 1295.) These same principles apply to the defense of others. (*People v. Randle* (2005) 35 Cal.4th 987, 997, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172.)

"'To satisfy the imminence requirement, "[f]ear of future harm— no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.'"" (*People v. Temple, supra,* 110 Cal.App.5th at p. 1295.) The defense also "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) If imperfect self-defense is properly presented, the

7

prosecution has the burden of disproving the defense beyond a reasonable doubt. (*People v. Schuller* (2023) 15 Cal.5th 237, 254–255; *People v. Rios* (2000) 23 Cal.4th 450, 462.)

Here, the evidence was sufficient to reject a finding of imperfect self-defense. Indeed, there was no evidence defendant subjectively believed he or Agustin C. faced imminent danger of death or great bodily injury. In his interview with police, defendant described the incident merely as a "brawl" and said he was "trying to defend [his] family." He never mentioned the victim reaching for a weapon or posing an imminent threat, and he did not testify at trial about any subjective fear of imminent danger. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581–582 [no evidence of imperfect self-defense where the defendant did not articulate a subjective belief in the need for self-defense].)

Defendant argues he pulled out his gun and fired it after the victim moved his hand underneath his sweatshirt while moving toward Agustin C. But the surveillance footage depicts defendant reaching for his gun while the victim was leaning over to put down his beer. In other words, defendant's gun was already drawn and ready when the victim stepped forward.

Defendant also emphasizes law enforcement found the victim with a pair of pliers. But there is no evidence defendant saw the pliers or believed the victim was armed at the time of the shooting. An actual belief in imminent danger must exist at the time of the homicide and cannot rest on post-hoc speculation. (*In re Christian S., supr*a, 7 Cal.4th at p. 783.)

Finally, the jury generally heard evidence that defendant was the most aggressive member of his group, argued with Geovanni V., and insulted the victim. The victim, by contrast, tried to deescalate the initial interaction

by shaking hands with defendant's group and stating he did not want any trouble. Defendant's companions also did not react as if there was an imminent threat. Instead, after the shooting, one of defendant's companions exclaimed, "What the fuck did you do?" These facts further undermine any claim that defendant genuinely perceived an imminent threat of death or great bodily injury.

## C. *Heat of Passion*

Defendant likewise argues there was insufficient evidence to disprove he acted in a heat of passion. We again disagree.

A murder may be reduced to voluntary manslaughter if the defendant acted in a heat of passion arising from sufficient provocation. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) The heat of passion requirement for manslaughter has a subjective and objective component. (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 584.) "'The defendant must actually, subjectively, kill under the heat of passion.'" (*Ibid.*) Objectively, heat of passion exists if "''at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'''" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) "'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) If provocation is properly presented, the prosecution has the burden of disproving provocation beyond a reasonable doubt. (*People v. Rios*, *supra*, 23 Cal.4th at p. 462.)

Here, the evidence did not compel a finding in defendant's favor on the objective prong. The victim's provocative conduct consisted of exchanging "bad looks" and mutual posturing such as "hitting up" defendant's group. But following this initial exchange, the victim shook hands with members of defendant's group and reassured he was not looking for any trouble. When a fight later broke out between Geovanni V. and Agustin C., the victim leaned over to set down his beer. At that point, defendant took out a gun. Although a jury might infer the victim's initial behavior was confrontational, it could also reasonably conclude the overall interaction had de-escalated and any provocation was insufficient to incite a loss of self-control in an ordinarily reasonable person.

Defendant contends the victim's conduct—returning back to defendant's group and taking a step forward while reaching near his waistband during Geovanni V.'s fight with Agustin C.—supported a reasonable inference defendant acted "while his reason was obscured by fear." But this argument, if anything, sounds in self-defense rather than heat of passion. While fear may bear on whether a defendant believed he faced imminent harm for purposes of self-defense, it does not, without more, support a heat-of-passion theory. (See *People v. Gutierrez, supra*, 45 Cal.4th at p. 826 [a "tussle" where the victim scratched and kicked the defendant was insufficient provocation]; *People v. Beltran, supra*, 56 Cal.4th at p. 950 ["[o]ne does not act rashly . . . simply by acting imprudently or out of anger" because "[e]ven imprudent conduct done while angry is ordinarily the product of some judgment and thought, however fleeting"].)

We accordingly will not disturb the jury's verdict finding defendant guilty of second degree murder. (*People v. Beltran, supra*, 56 Cal.4th at p. 948 ["'[J]urors . . . are . . . much better qualified to judge . . . the

10

sufficiency and tendency of a given provocation, and much more likely to fix, with some degree of accuracy, the standard of what constitutes the average of ordinary human nature . . . ."'].)

## II.

### THE COURT DID NOT ERR BY ADMITTING GANG-RELATED EVIDENCE

Defendant next contends the court erred by admitting gang evidence when there was no charged gang enhancement. According to defendant, the evidence should have been excluded under Evidence Code section 352 because it amounted to improper character evidence, had little probative value, and was inflammatory. For the reasons below, the court did not abuse its discretion by admitting the gang evidence, and the admission of this evidence did not violate defendant's due process rights to a fair trial.

### A. *Relevant Background*

Before trial, the prosecutor moved to admit gang-related evidence, including defendant's statement referencing "Muertos," to establish motive, intent, identification, and to explain witness reluctance to participate in the investigation. Because no gang enhancement was alleged, the prosecutor indicated he would not introduce evidence of Muertos' primary activities or predicate offenses.

Defendant's counsel moved to exclude the evidence under Evidence Code section 352, arguing it was irrelevant, unduly prejudicial, and risked suggesting guilt by association. Counsel emphasized the underlying incident lacked hallmarks of a gang-related offense and argued the evidence would improperly undermine defendant's right to self-defense.

In response, the prosecutor argued the evidence was probative of motive and intent, particularly given defendant's claim that he acted to

11

defend his "family." According to the prosecutor, this statement implied defense of a gang's reputation.

The court admitted the prosecutor's proposed gang evidence, finding its probative value outweighed any prejudicial effect. Among other things, the court noted there was evidence defendant said "Muertos" and "Fuck Crips" before the shooting, which the court found relevant to prove defendant's motive. But the court acknowledged the prejudicial nature of gang evidence and accordingly prohibited expert testimony on Muertos's primary activities, predicate offenses, or criminal street gang status.

The court also instructed the jury with CALCRIM No. 1403, which directed that evidence of gang activity could be considered only for the limited purpose of deciding whether the defendant: (1) "acted with the intent required to prove the crime charged;" (2) "had a motive to commit the crime charged;" (3) "actually believed in the need to defend defendant or someone else and acted under fear of imminent death or great bodily injury to defendant or someone else;" or (4) "acted in the heat of passion." The instructions further stated: "You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

## B. *Applicable Law and Standard of Review*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Even in cases that do not involve a gang enhancement, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Indeed, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*)

Assuming gang evidence is relevant, "the trial court must carefully scrutinize [the] evidence before admitting it because of its potentially inflammatory impact on the jury." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224.) Trial courts can "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review a trial court's decision concerning the admissibility of evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Clark* (2019) 43 Cal.App.5th 270, 291.)

## C.  No Abuse of Discretion

Here, the gang evidence was probative of defendant's motive for shooting the victim, which was disputed at trial. Before the shooting, defendant claimed affiliation with the Muertos gang, and someone in his group said, "Fuck Crips," which referred to a rival gang. After the shooting, defendant told police he was trying to protect his "family." The gang evidence provided necessary context for the jury to interpret these statements. The gang expert explained Muertos and Crips were rival gangs and that gang members view their fellow gang members as "family[,]" which would suggest

13

defendant's use of the term reflected a motive tied to gang respect rather than self-preservation. Without this context, jurors might have struggled to understand the significance of defendant's statements or to assess his imperfect self-defense claim.

Defendant emphasizes the shooting took place in a hotel outside of gang territory and involved individuals who had never met. He also notes there was no evidence the victim belonged to a rival gang or that Muertos gang members later bragged about the killing. These facts do not render the gang evidence irrelevant. Defendant himself made statements implicating gang-related issues, and gang evidence may be admissible when it explains the defendant's motive or intent. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 ["gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"]; *People v. Flores* (2020) 9 Cal.5th 371, 398.)

The trial court also correctly held the probative value of the gang evidence was not outweighed by its potential for prejudice. The prosecution's case focused on the surveillance footage, eyewitness accounts, and defendant's own statements. As to the gang expert, the court limited the expert's testimony by excluding evidence of Muertos's criminal street gang status, predicate offenses, or primary activities. And the court issued a limiting instruction, CALCRIM No. 1403, which informed the jury that it could not consider the gang evidence to conclude defendant had bad character or a disposition to commit crime. We must presume the jury understood and followed the limiting instruction. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

*People v. Albarran*, *supra*, 149 Cal.App.4th 214 and *People v. Memory* (2010) 182 Cal.App.4th 835, which defendant cites, are inapposite. In

14

*Albarran*, the court found extensive evidence about the Mexican Mafia, a variety of crimes committed by other members in the defendant's gang, and threats to the police, was irrelevant to the underlying charges and prejudicial. (*Albarran*, at pp. 227–228.) In *Memory*, the court held evidence of the defendants' membership in a motorcycle club was irrelevant and unduly inflammatory. (*Memory*, at p. 859.) The court noted the prosecutor offered the latter evidence "to show defendants had a criminal disposition to fight with deadly force when confronted." (*Ibid*.) The court added the prosecutor "continually portray[ed] defendants as members of a violent [one-percenter] outlaw motorcycle club akin to the Hell's Angels." (*Id.* at p. 861.)

Unlike the evidence in *Albarran* and *Memory*, the gang evidence in the instant case was relevant to the prosecution's theory of motive and was not offered to suggest defendant's predisposition to violence. Defendant himself referred to the Muertos gang and protection of his "family" before and after the shooting. Someone from defendant's group also said, "Fuck Crips" prior to the shooting. And the trial court carefully limited the scope of the gang evidence by instructing the jury on its proper use.

In short, the court properly exercised its discretion under Evidence Code section 352 in admitting the gang evidence.

D. *Harmless Error*

Assuming, arguendo, the trial court abused its discretion by admitting the gang evidence, any error was harmless. At the outset, defendant argues the error must be evaluated under the more stringent harmless "beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. The Attorney General, however, argues any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)—i.e., that it is not reasonably probable defendant would have obtained a more

15

favorable result without the gang evidence. We apply the *Watson* standard because admission of the gang evidence did not render the trial fundamentally unfair so as to implicate due process. (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Hunt* (2011) 196 Cal.App.4th 811, 817 ["'[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process'"].)

Here, there is no reasonable probability defendant would have received a better result if the gang evidence had been excluded. The evidence of defendant's guilt was strong even without the gang evidence. The incident was captured on video, and defendant admitted to police that he shot the victim. Although defendant claimed he acted in imperfect self-defense or out of a heat of passion, the jury viewed surveillance footage showing defendant draw his gun while the victim was leaning over and firing the gun without any visible weapon or imminent threat of death or great bodily injury from the victim. The jury also rejected the prosecution's theory of premeditated, gang-motivated murder by acquitting defendant of first degree murder. In other words, the gang evidence did not inflame the jury or tip the scales unfairly. Any error in admitting the gang evidence was therefore harmless.

DISPOSITION

The judgment is affirmed.


                              SANCHEZ, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


MOORE, J.